PATTON, APPELLANT, *v.* THE WESTWOOD COUNTRY CLUB CO., APPELLEE.

[Cite as Patton v. Westwood Country Club Co., 18 Ohio App. 2d 137.]

(No. 29243—Decided May 15, 1969.)

*Messrs. Nicola, Marsh & Gudbranson,* for appellant.
*Messrs. Hauxhurst, Sharp, Mollison & Gallagher,* for appellee.

CORRIGAN, J. Julia Patton, citizen of Rocky River, prosecutes this appeal on questions of law from a judgment of the Court of Common Pleas of Cuyahoga County denying to her certain injunctive relief prayed for as plaintiff and rendering judgment in favor of defendant, appellee herein, The Westwood Country Club.

The record reflects that The Westwood Country Club Company was formed as a private club in 1913. One year later the members constructed a nine-hole golf course on

the club premises. Nine additional holes were added in 1924. In 1929 the club had three hundred sixteen members, and by 1955 the membership had grown to three hundred seventy-five. By agreement of the members the maximum membership was reduced to three hundred fifty between the years 1955 and 1967.

In 1955 Julia Patton purchased a parcel of land immediately adjacent to the fairway of the Westwood Country Club's fifteenth hole. She built a home on this lot in 1956. Julia Patton's back yard abuts the Westwood Country Club premises on the south, or right side, of the fifteenth fairway approximately one hundred eighty yards east or off the tee. From the center of that portion of the fairway which is adjacent to the rear edge of Julia Patton's north property line there is a distance of about one hundred twenty-five feet. Other homes, located on both sides of Julia Patton's property, abut along the entire length of Westwood's three-hundred-seventy-five-yard fifteenth hole. None of these neighbors joined in this lawsuit, nor did any of them testify.

The gravamen of Julia Patton's complaint concerns the alleged proclivity of some golfers who play the fifteenth hole at Westwood to misplay their tee shots onto her demesne. According to testimony presented at the trial, stray golf balls from the Westwood premises have landed on Julia Patton's grounds on numerous occasions since 1956, and have broken windows on several occasions. In addition, a daughter of Julia Patton, one Angela, testified that she was struck on the leg by a golf ball in 1957, and a second daughter testified to several near misses.

The bill of exceptions reveals that Julia Patton knew of the location of Westwood Country Club when she purchased her lot in 1955 and when she built her home and moved into it during Easter week 1956. And it further shows that her deceased husband and her sons have played golf in the past, and that one daughter took golf lessons. Her testimony reflects that in July 1957, when Julia Patton was in her yard, a golf ball "went right over my head, and then it hit the side of my house, and then landed at my

foot." The condition Julia Patton complains of has really existed since she built the house and moved into it, according to the record. Her daughter Angela said that golf balls had landed on the Julia Patton property as early as 1956, and she also testified, in reply to a question as to whether the situation has remained constant or has worsened, that the situation has remained constant during the golf season.

It is generally known that the average golfer does not always hit the ball straight. See *Gardner v. Heldman* (1948), 82 Ohio App. 1. One less than the Mosaic decalogue, the adjurations enjoined by acroamatic golf professionals, upon the millions of votaries of the royal and ancient sport, in interpreting the esoteric principles of the golf swing are: don't slice, hook, push, pull, sky, sclaff, smother, top or shank.

The literature of the sport fills countless library shelves, on sub-topics ranging from proper mental attitudes by some of the game's more recondite gurus to tracts on putting styles perfected during the winter season before glowing fireplaces on deep-piled Royal Kermanshah rugs by preserved old codgers.

Julia Patton's jeremiad over Westwood's golfers may be related chiefly to one of those faults forbidden to the initiated of the links, namely, that of slicing by right handers. The root of this evil is the propensity to hit the ball with a club face that is open at impact, usually from the outside in. Some few confirmed slicers allow for it by aiming all shots to the left, and the resulting curve to the right lands the ball at the desired spot in the fairway. One nationally known amateur, Judge Don C. Miller, of Notre Dame's famed "Four Horsemen," employs such an educated slice regularly. It is a matter of common knowledge that he can curl a drive around a *Thujopsis dolobrata* one hundred and fifty yards out and split the fairway ahead of it. This is one of his things of life. An uneducated slice apparently is a thing of life for some Westwood members or guests.

There seem to be just three other forbidden shot possibilities that could reach Julia Patton's estate from West-

wood's fifteenth tee. The first of these is the push which occurs when the right-handed player hits the ball with an open face while the club is still moving from inside out. It is generally a straight ball that goes to the right of the target. Since the center of the fifteenth fairway is one hundred and twenty-five feet from the northern boundary of the Patton property, such a push on the part of Westwood's fine players would probably be a rarity landing on the Patton plot.

The two other *verboten* hits that might reach our complainant's private preserve would necessarily be directed thereto by left-handed golfers. In order of importance, they are hooks and pulls. Hooking is hitting with a closed face, and this really is a venial golf sin. It is considered the good player's error. The hook for the southpaw curves to the right, and in the pull the left-handed player hits the ball straight to the right of the target. The record before us does not demonstrate how many left-handed golfers play Westwood in a season.

Upon consideration of the facts, the trial judge found in favor of Westwood Country Club, denying plaintiff's plea for temporary and permanent injunctions.

Plaintiff, appellant herein, raises three assignments of error as follows:

(1) The judgment is contrary to law.

(2) The judgment is against the weight of the evidence.

(3) Other errors occurring at trial.

Instead of treating each assignment of error separately, plaintiff in her brief establishes two central issues which she then discusses. These issues are: (1) whether hitting golf balls onto plaintiff's property constitutes a private nuisance; and, if so, (2) whether plaintiff is entitled to injunctive relief from such nuisance.

Under a broad definition of the term "nuisance," the activity of defendant's erring golfers could be included. In Black's Law Dictionary (4th Ed., 1951), nuisance is defined as: "That which annoys and disturbs one in possession of his property, rendering its ordinary use or occu-

pation physically uncomfortable to him.'' See, also, *State, ex rel. Chalfin,* v. *Glick* (1960), 113 Ohio App. 23; *Antonik* v. *Chamberlain* (1947), 81 Ohio App. 465. Also, there is authority to the effect that golf balls driven onto adjoining premises can be considered a nuisance. *Gleason* v. *Hillcrest Golf Course, Inc.* (1933), 148 Misc. 246, 265 N. Y. S. 886.

Assuming for the moment that hitting golf balls onto plaintiff's premises comes within the definition of a private nuisance, the next consideration is whether the complained of activity should be enjoined under the circumstances of this case. The trial court relied heavily on the well-known defense that plaintiff ''came to the nuisance.'' The ancient principle behind this defense is expressed in the maxim ''*volenti non fit injuria.*'' 39 American Jurisprudence 471, ''Nuisances,'' Section 195; 5 Powell on Real Property (1968), 335-336, Section 706. Ohio courts have recognized this defense in many cases. *Eller* v. *Koehler* (1903), 68 Ohio St. 51; *Steele* v. *Rail & River Coal Co.* (1927), 42 Ohio App. 228; *Oetjen* v. *Goff-Kirby Co.* (1942), 38 Ohio Law Abs. 117; *Harden Chevrolet Co.* v. *Pickaway Grain Co.* (1961), 92 Ohio Law Abs. 161; 41 Ohio Jurisprudence 2d 172, ''Nuisances,'' Section 79; 167 A. L. R. 1364 (1934). There is authority in Ohio that the complaining party must have been aware of the situation in order that the defense may be used against him. *Cilly* v. *Cincinnati* (1877), 7 Dec. Rep. 344; 41 Ohio Jurisprudence 2d 163, ''Nuisances,'' Section 67. Plaintiff contends that she was not aware of the situation initially due to the fact that the golf ball problem has grown gradually worse over the years. There is some evidence in the record, contributed by plaintiff and her daughters, to support this contention. There is considerable evidence, from plaintiff's witnesses and others, that the condition has remained stable. This latter body of evidence speaks eloquently of the quality of play of Westwood's membership and, in turn, of the quality of instruction of the professional staff. Thus, the trial judge, who was in a position to hear the witnesses and evaluate their testimony, cannot be said to have found against the

manifest weight of the evidence when he determined that the golf ball hazard had not increased substantially between the years 1956 and 1967.

In comparing the equities of the situation, it should be noted that no one on the Patton premises has been struck by a golf ball since 1957. Also, in 1963 Westwood Country Club did attempt to appease plaintiff by changing the sprinkling system on the fifteenth fairway, by moving the fairway farther away from the Patton premises, and by planting twenty pine trees opposite plaintiff's lot. The cost of these changes was approximately $2,000. Finally, the trial court had for consideration the testimony of defendant's golf expert that the changes to the fifteenth hole proposed by plaintiff's expert would cost approximately $25,000; would ruin the character of the hole; and would not decrease the golf hazard to neighboring homeowners. Therefore, there was strong evidence in the record in support of the trial court's decision.

In the few reported decisions where courts have issued injunctions against fallible golfers and the clubs or organizations which harbor them, the factual situations are readily distinguishable from the case at bar. See, for example, *Gleason* v. *Hillcrest Golf Course, Inc.* (1933), 148 Misc. 246, 265 N. Y. S. 886; *Mruskovic* v. *McMullen* (1948), 65 Montgomery Co. L. R. (Pa.) 257; *Sans* v. *Ramsey Golf & Country Club* (1958), 29 N. J. 438, 149 A. 2d 599, 68 A. L. R. 2d 1323.

It is our conclusion, and we so hold in this appeal, that the trial court's denial of plaintiff's petition for injunction was not contrary to law or against the weight of the evidence. It is our further conclusion, and we so hold, that plaintiff's third assignment of error—"other errors occurring at trial"—is not supported by the record and is overruled. For the reasons stated the judgment of the Common Pleas Court is affirmed in favor of The Westwood Country Club and against Julia Patton.

*Judgment affirmed.*

SILBERT, C. J., and ARTL, J., concur.