(No. 89269.—

LARRY GEDDES *et al.*, Appellants, v. MILL CREEK
COUNTRY CLUB, INC., *et al.*, Appellees.

*Opinion filed May 24, 2001.—Rehearing denied June 29, 2001.*

Zukowski, Rogers, Flood & McArdle, of Crystal Lake (Michael J. Smoron, of counsel), and Timothy P. Dwyer, of St. Charles, for appellants.

Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., of Ottawa (Michael T. Reagan, of counsel), and Foote, Myers, Mielke, Flowers & Solano, LLC, of Geneva (Robert M. Foote and Craig S. Mielke, of counsel), for appellees.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiffs, Larry and Choh-Ying Geddes, filed a com-

plaint in the circuit court of Kane County against defendants, Mill Creek Country Club, Inc., and American Golf Corporation. The complaint contained actions for intentional trespass and intentional private nuisance based on errant golf balls hit onto their property from defendants' adjacent golf course. Following a bench trial, the trial court entered judgment in favor of defendants. The appellate court affirmed. No. 2—99—0370 (unpublished order under Supreme Court Rule 23). We allowed plaintiffs' petition for leave to appeal (177 Ill. 2d R. 315(a)). We now affirm the judgment of the appellate court.

## BACKGROUND

Plaintiffs' complaint, as amended, alleged as follows. Plaintiffs own approximately 16 acres of land in Kane County. They reside on the property and use it for their gradually developing agricultural and landscaping business.

Mill Creek Country Club constructed and owns a golf course known as Mill Creek Golf Club. The course is leased to American Golf Corporation, which performs daily tasks such as collecting greens fees and maintaining the course.

Defendants caused and allowed golf balls to continually invade plaintiffs' property. Plaintiffs' business is seasonal and coincides with the golf season. "[D]ue to the constant stream of uninvited, wayward golf balls," plaintiffs have not been able to use significant portions of their property. Defendants' intentional acts constituted both an intentional trespass and a private nuisance. Plaintiffs sought an injunction against defendants, i.e., plaintiffs asked the trial court to "enjoin the Defendants from causing and allowing the continual trespass of golf balls to occur." Plaintiffs also sought compensatory and punitive damages.

In their answer, defendants denied all material al-

legations and pled the affirmative defense of estoppel. Defendants alleged that plaintiffs were estopped from bringing their claims by virtue of plaintiffs' conduct, memorialized in a prior agreement.

Prior to trial, the court: denied plaintiffs' motion for a temporary restraining order; entered an agreed order dismissing plaintiffs' motion for a preliminary injunction; denied defendants' motion to dismiss (see 735 ILCS 5/2—615, 2—619 (West 1998)); and denied plaintiffs' motion for summary judgment (see 735 ILCS 5/2—1005 (West 1998)). The cause proceeded to a bench trial.

The evidence at trial included the testimony of plaintiffs; Kent Shodeen, president of Sho-Deen, Inc.; and David Patzelt, vice-president of Sho-Deen. The parties presented the following pertinent evidence. In 1986, plaintiffs bought 16.5 acres in Kane County. The property is rectangular in shape, with the north-south dimension slightly larger than the east-west dimension.

In the same area, Sho-Deen was developing approximately 1,450 acres as a planned unit development. A planned unit development is a land use control device that often combines subdivision regulations and zoning for the unified development of a large geographic area. Rather than seeking piecemeal variances or rezoning, a coordinated plan is drawn up and approved as a special use for the entire proposed area. See 9 Real Property Service: Illinois § 49:1, at 8 (1989); accord 2 K. Young, Anderson's American Law of Zoning § 11:12 et seq. (1989). The concept of this development, known as the Mill Creek Development, was to combine open space with residential areas. A golf course was to constitute part of that open space. The development surrounds plaintiffs' property. A public road, Bartelt Road, adjoins the east side of the property. The land adjoining plaintiffs' western boundary was formerly a cornfield.

In 1986 and 1987, Shodeen interviewed golf course

architects. He also began work with government agencies and adjoining neighbors of the development, including plaintiffs, to obtain approval and authority for planning the development. The neighbors had the right to contest the development by objecting tò those government agencies.

In 1991, the Mill Creek Country Club, Inc., was created as a subsidiary to Sho-Deen, with Shodeen as the country club's sole shareholder. Its purpose was to design and build a golf course.

In April 1992, Shodeen invited plaintiffs and other neighbors to review the concept plan for the development. For the next two years, plaintiffs and Shodeen negotiated. However, they now disagree as to the subject of their negotiations and the result thereof.

According to defendants, Shodeen negotiated with plaintiffs so that the development would impact them as little as possible. The original concept plan provided for the rear lawns of single-family residences to adjoin plaintiffs' western boundary. Facing these residences would be a golf course fairway. The fairway would have residences facing it on the east and the west. In other words, the residences facing the fairway on the east would stand between it and plaintiffs' western boundary.

Plaintiffs told Shodeen that they did not want housing adjoining their property. Shodeen then permitted plaintiffs to choose between the housing, a bicycle path, or the fairway. Plaintiffs chose the fairway to abut their property's western boundary and made other requests that he granted. Accordingly, Shodeen changed the development plan by removing the housing on the east side of the fairway and relocating the fairway to adjoin plaintiffs' western boundary.

According to Shodeen, Larry Geddes not only negotiated an agreement with Shodeen, but also publicly endorsed it. In June or July 1993, Geddes spoke at a

county development planning committee meeting. Geddes said that "he had worked quite a bit with Mr. Shodeen in order to get things where they are, and he didn't want the board to mess around with it." By that time, Shodeen and Geddes had agreed on placing the golf course adjacent to the western boundary of plaintiffs' property.

However, according to plaintiffs, they did not negotiate any specific land use of defendants' property. Rather, plaintiffs only wanted assurances from defendants that the use of their property would not impact plaintiffs' property use. Plaintiffs never requested that a golf course—especially a golf course fairway—be located adjacent to their property.

On June 3, 1994, plaintiffs and Sho-Deen signed an agreement, which stated in pertinent part:

"Sho-Deen, Inc., will provide and install at its expense an eight foot (8') high chain link fence with two (2) fourteen foot (14') entrance gates on Bartelt Road along the complete common border of the Mill Creek Development with the Geddes' property. The fence and gates will be installed *when the golf course fairway that borders the Geddes' western property line is constructed \*\*\*.*" (Emphasis added.)

The agreement further provides as follows. Sho-Deen would plant a landscape border along the Mill Creek side of the fence. Sho-Deen would not plan a bicycle path along any border of plaintiffs' property, or construct any houses within 100 feet of the south and west boundaries thereof. Sho-Deen would provide for a 40-foot "green area and landscape easement" along the south boundary of plaintiffs' property. The agreement made several references to a "golf course." The agreement concludes that plaintiffs agree not to protest the development as long as Sho-Deen complies with the agreement.

Sho-Deen received county approval for the Mill Creek development. None of the neighboring property owners

or relevant government agencies objected. The development has received an award for design excellence from the National Association of Builders.

Mill Creek Country Club interviewed approximately 25 architects before hiring golf course architect Roy Case to design the Mill Creek Golf Course. Case followed all recognized design criteria. The golf hole at issue is described in the record as either "Hole #5" or "Hole #14" (hereafter, fifth hole). The fairway for the fifth hole runs south to north and lies adjacent to the western boundary of plaintiffs' property. The hole is designed so that the first shot is slightly to the west of, *i.e.*, away from, plaintiffs' property. The second shot is slightly east, towards the northwest corner of the property.

The fairway for the fifth hole is 300 feet wide, and is separated from plaintiffs' property by a 25-foot "rough" area. An asphalt golf cart path lies between the fairway and the rough. As noted earlier, an eight-foot-high chain link fence and landscaping, which includes trees over that height, surround plaintiffs' property.

The width of both the fairway and the rough meet recognized design standards. Similar 25-foot separations exist elsewhere in the development.

The following conditions favor golfers hitting errant shots toward plaintiffs' property. The prevailing winds move from the west to the east. Also, most golfers slice rather than hook, *i.e.*, hit the ball to the right of the target as opposed to the left. The following conditions disfavor golfers hitting errant shots toward plaintiffs' property. Plaintiffs' property is out of bounds; golfers are penalized if they hit balls onto plaintiffs' land. No part of the fairway runs in the direction of plaintiffs' property. Also, the fence and trees separate the fifth hole from plaintiffs' property.

Mill Creek Golf Course began operating in 1996. The course is open to the public. In 1997, approximately

21,000 rounds of golf were played there; in 1998, approximately 23,500 rounds were played. An average of approximately 30,000 rounds of golf are played on courses in the greater Chicagoland area.

When the course opened, plaintiffs began to find golf balls on their property. During the 1997 and 1998 golf seasons, plaintiffs collected 2,128 golf balls on their property. Some of these had landed as far away as 300 feet from the property's western boundary.

Plaintiffs testified as to how the invading golf balls harmed them. Plaintiffs previously grew alfalfa in the area where the golf balls landed. Indeed, a golf ball once struck Larry's tractor while he was mowing the alfalfa field. Plaintiffs planned to use the affected area to grow plants for sale, cultivate "pick-your-own" vegetables, and build greenhouses and similar structures. Plaintiffs had drilled a well and had hired an architect to plan a retail nursery building. Plaintiffs feared that the golf balls would injure themselves, their family, and their customers, and would damage their planned greenhouses.

However, the following evidence was also adduced at trial. Plaintiffs' residence and other existing buildings are not in the affected area. No person on plaintiffs' property had ever been struck by an invading golf ball. Persons on plaintiffs' property would be in no more danger of being struck than those walking in other areas in the development. No one had ever told plaintiffs that the golf balls inhibited the property's suitability for being farmed. Plaintiffs stopped growing the alfalfa crop not because of the golf balls, but rather because they planned to use that land for cultivating plants for their nursery business. No one had ever told plaintiffs that the golf balls prevented them from placing greenhouses in the area or cultivating plants for their nursery business.

Shodeen was asked whether, at the time of the agreement, he knew that plaintiffs would have golf balls on

their property. He answered: "I would imagine they'd have some, sure." However, it "[d]idn't occur" to him to "specifically tell them they were going to have golf balls." Also, the agreement with Sho-Deen did not specifically mention the possibility of golf balls entering plaintiffs' property.

Plaintiffs testified that they knew nothing about the game of golf. If plaintiffs had anticipated the golf ball problem and its impact on their property, they would have objected to the golf course.

Defendants presented testimony that the development generally increased the value of plaintiffs' property. Sho-Deen paid for most of the construction costs of a new school located near plaintiffs' property. A neighborhood school further increases property values. Particularly, the placement of the golf course fairway adjacent to plaintiffs' property further enhanced the value of plaintiffs' land.

Plaintiffs complained to defendants that the invading golf balls interfered with plaintiffs' business and residential quality of life. Defendants, through their legal counsel, responded only that the course met industry standards. However, Shodeen talked with plaintiffs about defendants' possibly planting additional trees adjoining plaintiffs' property, but no agreement was reached. At least once, Shodeen asked plaintiffs if they wanted to relocate at his expense. According to Shodeen, it would not be possible to relocate or otherwise change the fifth hole because of the various approvals necessary from all of the applicable government agencies.

In closing argument, plaintiffs clarified that they were not seeking monetary damages. They also acknowledged "that it's virtually impossible to abate *** all of the golf balls from coming into their property. Once in awhile you're going to have an errant shot. It's going to go in there." However, plaintiffs complained that

"they've gotten absolutely nothing from the Defendants." In their trial brief, plaintiffs suggested, *inter alia*, that the court "could order that [the fifth hole] be closed until such time that Defendants have implemented a plan to abate the trespass and nuisance."

Following the trial, the court found, *inter alia*:

"4) *** [T]here was no evidence produced as to what specific acts the defendants themselves engaged in or the manner in which those activities were conducted which caused or enabled the golf balls to go into plaintiffs' property.

5) Moreover there was no evidence produced as to what actions the defendants could have taken, but didn't, to prevent or limit the golf balls from landing in plaintiffs' property.

6) Rather the evidence shows that the Fifth Hole by design went north from the teebox to the green requiring that golf balls be driven in a direction other than toward the plaintiffs' property.

7) In addition the easterly border of the defendants' property immediately adjacent to the plaintiffs' property was landscaped in such a fashion as to render it out of bounds to golfers thereby removing any need or incentive to intentionally drive a golf ball in the direction of the plaintiffs' property.

8) Use of one's property for a golf course is neither unlawful nor a nuisance per se and there was no evidence produced that the golf course here constituted an ultra hazardous activity.

9) Under the circumstances shown by the evidence produced by the plaintiffs a claim to enjoin altogether the use by defendants of their property as a golf hole is over broad and facially inequitable.

10) The plaintiffs have failed to sustain their burden of proof."

The trial court entered judgment in favor of defendants.

The appellate court, with one justice dissenting, affirmed, holding that the trial court's judgment was not against the manifest weight of the evidence. No. 2—99—0370 (unpublished order under Supreme Court Rule 23).

The appellate court concluded that defendants' conduct did not constitute an intentional trespass and an intentional private nuisance. Accordingly, the appellate court reasoned that there was no basis for the trial court to issue an injunction.

Plaintiffs appeal. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

## DISCUSSION

Plaintiffs contend that the evidence at trial demonstrated that defendants' conduct resulted in an intentional trespass and an intentional private nuisance. Defendants contend that the evidence demonstrated that plaintiffs should be estopped from bringing their claims. We first consider defendants' contention.

### Equitable Estoppel

Defendants invoke the doctrine of equitable estoppel. Defendants claim that plaintiffs, by their conduct, are estopped from bringing their action. According to defendants, plaintiffs chose the fairway over other options that Sho-Deen presented to them and made other requests that Sho-Deen granted. Sho-Deen, at great expense, redesigned the development plan to accommodate plaintiffs. The agreement between plaintiffs and Sho-Deen, which contains several references to a golf course and a specific reference to the fairway, memorializes plaintiffs' requests. Defendants argue that plaintiffs' conduct prevents them from maintaining this action.

Defendants pled this affirmative defense and presented supporting evidence and argument in the trial court and argued it in the appellate court. The trial court made no findings regarding this issue and the appellate court did not address it. However, "the appellee may urge any point in support of the judgment on appeal, even though not directly ruled on by the trial court, so long as the factual basis for such point was before the

trial court." *Shaw v. Lorenz*, 42 Ill. 2d 246, 248 (1969); accord *American National Bank & Trust Co. v. National Advertising Co.*, 149 Ill. 2d 14, 21 (1992); *La Salle National Bank v. Village of Grayslake*, 29 Ill. 2d 489, 492 (1963). Since the record contains the factual basis for the defense of equitable estoppel, we will address the merits of this contention.

The general rule is that where a person by his or her statements and conduct leads a party to do something that the party would not have done but for such statements and conduct, that person will not be allowed to deny his or her words or acts to the damage of the other party. *Dill v. Widman*, 413 Ill. 448, 455 (1952); *Bondy v. Samuels*, 333 Ill. 535, 545 (1929). Equitable estoppel may be defined as the effect of the person's conduct whereby the person is barred from asserting rights that might otherwise have existed against the other party who, in good faith, relied upon such conduct and has been thereby led to change his or her position for the worse. *M.J. Oldenstedt Plumbing Co. v. K mart Corp.*, 257 Ill. App. 3d 759, 764 (1994); *Byron Community Unit School District No. 226 v. Dunham-Bush, Inc.*, 215 Ill. App. 3d 343, 348 (1991); 18 Ill. L. & Prac. *Estoppel* § 22 (1956).

To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel

would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof. *Vaughn v. Speaker*, 126 Ill. 2d 150, 162-63 (1988).

Regarding the first two elements, the representation need not be fraudulent in the strict legal sense or done with an intent to mislead or deceive. *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 148 (1986). Although fraud is an essential element, it is sufficient that a fraudulent or unjust effect results from allowing another person to raise a claim inconsistent with his or her former declarations. *Cessna v. Montgomery*, 63 Ill. 2d 71, 86 (1976); *Dill*, 413 Ill. at 456; *M.J. Oldenstedt Plumbing Co.*, 257 Ill. App. 3d at 764. The following corollary must be remembered:

> "Estoppel may arise from silence as well as words. It may arise where there is a duty to speak and the party on whom the duty rests has an opportunity to speak, and, knowing the circumstances, keeps silent. [Citations.] It is the duty of a person having a right, and seeing another about to commit an act infringing upon it, to assert his right. He cannot by his silence induce or encourage the commission of the act and then be heard to complain." *Bondy*, 333 Ill. at 546.

The question of estoppel must depend on the facts of each case. The party claiming estoppel has the burden of proving it by clear and unequivocal evidence. *Jennings v. Bituminous Casualty Corp.*, 47 Ill. App. 2d 243, 249 (1964); see 18 Ill. L. & Prac. *Estoppel* § 36 (1956).

Applying these principles to this case, we conclude that defendants' estoppel defense is meritorious. Injustice would result in allowing plaintiffs to bring these claims. Plaintiffs, by their conduct, induced or encouraged defendants to design and build the fifth hole. For plaintiffs to assert these claims now would be inequitable and damage defendants.

Plaintiffs attempt to avoid the consequences of their conduct with Sho-Deen. Initially, plaintiffs claim in their

reply brief that they "never *requested* that the golf course be located next to their property." (Emphasis added.) This is beside the point. The record clearly and unequivocally shows that plaintiffs knowingly *agreed* to the placement of the fairway. The original concept plan provided for single-family residences to adjoin the western boundary of the property. Sometime during the following two years, Sho-Deen and plaintiffs agreed on the placement of the fifth hole fairway next to plaintiffs' property. The record contains unrebutted testimony that, prior to signing the formal agreement, Larry Geddes informed a county development planning committee meeting of his work with Shodeen and asked the board not to alter any of the proposed plans as they related to him. Finally, plaintiffs signed the 1994 agreement, which refers throughout to a golf course, and once specifically to "the golf course fairway that borders the Geddes' western property line."

Acknowledging that they agreed to the placement of the fifth hole adjacent to their property, plaintiffs contend that their decision was not a knowing one. In their reply brief, plaintiffs argue that "the agreement is silent as it relates to golf balls," and "the concept of golf balls is never addressed in the 1994 agreement." Plaintiffs testified that when they signed the agreement, and during the construction of the golf course, they knew nothing about the game of golf. They had no idea of the number of errant golf balls that would enter their property.

This contention lacks merit. That golfers do not always hit their golf balls straight is a matter of common knowledge; it is a fact that needs no supporting evidence, a principle that needs no citation of authority. Courts have long acknowledged this axiom: " 'It is well known that not every shot played by a golfer goes to the point where he intends it to go. If such were the case, every player would be perfect and the whole pleasure of the

sport would be lost.' " *Campion v. Chicago Landscape Co.*, 295 Ill. App. 225, 241 (1938), quoting *Benjamin v. Nernberg*, 102 Pa. Super. 471, 475-76, 157 A. 10, 11 (1931); accord *Patton v. Westwood Country Club Co.*, 18 Ohio App. 2d 137, 139, 247 N.E.2d 761, 763 (1969) ("It is generally known that the average golfer does not always hit the ball straight"). Indeed, "it is a matter of common knowledge that on practically all golf courses, including those constructed on vast acreages where the fairways are wide and well separated by rough and shrubs," a golfer can slice or hook a ball off of the fairway. *Campion*, 295 Ill. App. at 235. For a thorough discussion of the various golf errors that could result in golf balls intruding on plaintiffs' property, see *Patton*, 18 Ohio App. 2d at 139-40, 247 N.E.2d at 763. This condition is as natural as gravity or ordinary rainfall.

We repeat: it is a matter of common knowledge that golfers do not always hit their shots straight. Defendants knew it. This axiomatic proposition is evidenced by Shodeen's assumption that plaintiffs would have some golf balls on their property. However, plaintiffs also knew it. This is evidenced by the agreement provision that plaintiffs' property be surrounded by an eight-foot-high fence with landscaping that includes trees over that height. Even assuming that plaintiffs did not know of this fact of life, they reasonably should have. Plaintiffs cannot avoid the reasonable results of their conduct.

Regarding the third element of equitable estoppel, defendants did not know, either at the time of the agreement or during the construction of the fifth hole, that plaintiffs would act in a manner contrary to the agreement. Fourth, plaintiffs, of course, expected that Sho-Deen would perform all of the provisions of the 1994 agreement. Plaintiffs' promise not to protest the construction of the golf course, specifically the fifth hole, was conditional on Sho-Deen's compliance with the agreement.

Fifth, defendants reasonably relied upon plaintiffs' conduct to their detriment. All agreements between adults should be entered into thoughtfully. This admonition takes on increased significance in the context of a planned unit development:

> "*Obtaining approval for a planned unit development can involve considerable negotiation*: with other developers on a project, *with the community*, and with the local zoning board. \*\*\* Often more amenities, such as open space or recreational facilities, are provided under a PUD [planned unit development] than could be required by local law." (Emphasis added.) 9 Real Property Service: Illinois § 49:1, at 8 (1989).

The creation of the golf course, specifically the fifth hole, required considerable negotiation with many public and private parties, including plaintiffs. Sho-Deen obtained their approval and, based thereon, built the fifth hole.

Regarding the sixth element of equitable estoppel, defendants would be prejudiced if plaintiffs were permitted to deny their conduct. Initially, the original concept plan had residences adjoining the fifth hole on the east, between the fairway and plaintiffs' property. The record contains unrebutted evidence that there would have been approximately 14 of these lots, and Shodeen would have charged an additional $15,000 for each lot because it would have adjoined the fairway. Thus, Sho-Deen lost approximately $210,000 in lot "premiums" by placing these residences elsewhere. Additionally, the record contains evidence that Sho-Deen incurred other costs in relocating the fifth hole, *e.g.*, $25,000 for re-engineering the area.

Not only did Sho-Deen incur costs in relocating the fifth hole, it now would be problematic to move it or close it. Residences were planned for the west side of the fifth hole. The price of those lots include the additional "premium" for adjoining the fairway. If Sho-Deen now moved or closed the fifth hole, it could be liable for violat-

ing the PUD agreement with other lot owners. See *Chicago Title & Trust Co. v. Weiss*, 238 Ill. App. 3d 921, 925-26 (1992).

"An injunction will be refused where the complainant has actively encouraged defendant to undertake the work and then has silently, without protest, permitted defendant to go ahead with the work in disregard of the right of complainant." *Bondy*, 333 Ill. at 551. In this case, plaintiffs are equitably estopped from bringing their claims.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Appellate court judgment affirmed.*