2023 IL App (1st) 230188-U

No. 1-23-0188

Order filed November 20, 2023.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| JOYCE CHARLENE BERG, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2018 L 008476 |
| | ) | |
| DIAMOND HEADACHE CLINIC, LTD., and BRADLEY | ) | The Honorable |
| TORPHY, M.D., | ) | John H. Ehrlich, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court properly entered summary judgment in favor of defendants because plaintiff failed to show that her personal injury claim was timely filed within the applicable statute of limitations period or that defendants were equitably estopped from asserting that defense. We affirm.

¶ 2     Plaintiff, Joyce Charlene Berg, was a patient at Diamond Headache Clinic, Ltd.

(Diamond Headache), where she regularly received Botox treatments for migraines and

Methadone shots in her buttocks for pain management. Following a routine Methadone injection, plaintiff suffered temporary symptoms of paralysis, as well as damage to her sciatic nerve, ultimately leading her to be admitted to the hospital for a few days.

¶ 3    Due to her injury, plaintiff filed the instant personal injury action against defendants Diamond Headache and one of its physicians, Dr. Bradley Torphy, alleging their negligence in allowing an unexperienced nurse to administer plaintiff's Methadone injection both actually and proximately caused her injury. Plaintiff, however, filed her complaint more than two years after she received the injection. The circuit court thus entered summary judgment in favor of defendants on the ground that the action was barred by the statute of limitations.

¶ 4    On appeal, plaintiff contends that the circuit court erroneously granted summary judgment to defendants because the discovery rule, which delays commencement of the applicable limitations period, applied in this case since plaintiff did not know of her injury and that it was wrongfully caused on the date she received the injection. Plaintiff further asserts that, even if the discovery rule did not apply, defendants were equitably estopped from raising a statute of limitations defense because one of their agents assured plaintiff that her injury could not have been caused by the injection. According to plaintiff, these issues, at the very least, raised questions of fact precluding summary judgment. We disagree, and for the reasons that follow, we affirm the circuit court's judgment.

¶ 5                                    I. BACKGROUND

¶ 6    The following relevant facts were gleaned from the parties' pleadings, affidavits, depositions, and other supporting documents, and were presented to the court below.

¶ 7    Beginning in 2011, plaintiff began receiving treatment at Diamond Headache for chronic, severe migraines, a condition she has suffered from since childhood. Specifically, plaintiff

visited Diamond Headache approximately every three months for Botox injections to address her migraines. This process called for about 31 injections in plaintiff's head, neck, and shoulders, each visit. In addition to receiving Botox injections, plaintiff also received an intramuscular injection in her buttocks of Methadone and Phenergan to treat chronic pain. That process was always the same: plaintiff would stand upright, leaning against a table, and receive the injection on the left side of her buttocks (the left side was at plaintiff's request).

¶ 8    On July 22, 2016, plaintiff, then 50 years old, went to Diamond Headache for her routine Botox and Methadone injections. As usual, a nurse administered the Methadone injection in the same location on plaintiff's left buttocks. According to plaintiff, the injection this time was much more painful than usual. Plaintiff testified in her deposition that: "While [the nurse] was giving me the injection, *** it hurt so bad. I screamed. I said, ow. Something along the lines of, ow, that really hurts." Plaintiff further testified that, "[the injection] was very, very painful," that "it never felt like that before," and that, "[i]t was like a really deep-seated pain," a "searing pain."

¶ 9    Plaintiff's husband drove her home that day, but when they got there, plaintiff could not move. According to plaintiff, when she initially tried to move, she fell, injuring her head and leg. Plaintiff claimed she "was completely paralyzed on the left side from the hip down." Consequently, plaintiff's husband had to carry her inside their home. Over the next few days, plaintiff began to regain some feeling in her left leg, although it felt very painful.

¶ 10    Three days later, on July 25, 2016, plaintiff visited her primary care physician, Dr. Catherine Thomas, where she was evaluated by Dr. Thomas and her physician's assistant, Amy Frazer. PA Frazer noted that plaintiff presented with numbness, tingling, pain, and swelling in her left leg following a Methadone injection at Diamond Headache. Frazer further noted that plaintiff had "inflammation from the injection site hitting her sciatic nerve" and that "[plaintiff]

is very thin \*\*\* so [her sciatic nerve] could have easily been irritated by the injection." To rule out deep vein thrombosis (DVT), PA Frazer ordered an ultrasound for plaintiff which showed she was negative for DVT.

¶ 11    A couple days later, plaintiff presented to the emergency room at Delnor Hospital, located in Geneva, Illinois, for migraine-related pain. Plaintiff was given pain medication and was advised to follow-up with Diamond Headache regarding her migraines. She was discharged from the hospital later that day.

¶ 12    Shortly thereafter, on July 29, 2016, plaintiff again saw PA Frazer for pain in her left leg. According to plaintiff, she could not "scrunch her toes" on the left side. PA Frazer diagnosed plaintiff with sciatic neuritis, which typically occurs when the sciatic nerve is pinched. PA Frazer noted that she believed plaintiff suffered from "irritation to [her] Sciatic Nerve from the injection." PA Frazer further noted there likely would be no change to plaintiff's condition for a couple weeks, so she advised plaintiff to schedule a follow-up appointment at that time. In the meantime, plaintiff was advised to keep PA Frazer updated as to her condition.

¶ 13    Nevertheless, on July 31, 2016, plaintiff presented to the emergency room at Delnor Hospital, this time for lower leg pain. Plaintiff's intake notes stated: "This is a 50-year-old female with a history of chronic migraines who had an injection on 7/22/16 and feels that it may [have] been close to the sciatic nerve as within the next 2 days she developed pain down the posterior aspect of her left leg." Further, plaintiff "states it's a burning type of pain" that is "[s]evere in intensity." Plaintiff was subsequently diagnosed with sciatica and was discharged from the hospital that day.

¶ 14    On August 2, 2016, plaintiff emailed Lana Tymouch, a physician's assistant at Diamond Headache, stating:

"I had a horrible experience at Diamond Headache Clinic on July 22nd, 2016. I had Botox done, which was fine, but afterwards I took at [*sic*] pain shot by an apparently inexperienced nurse who put the needle in the sciatic nerve. I was aware that the shot was more painful than usual as soon as the shot was administered but didn't connect that the pain was coming from the sciatic nerve until we got home an hour later and my husband had to literally carry me out of the car and into the house because by [*sic*] foot and leg were paralyzed on the left side (which is were I received the shot)."

Plaintiff further stated:

"I also feel that Diamond Headache Clinic should be responsible for paying any part of my doctors visits, ultrasound, emergency room visit, and missed workdays due to negligence. *** Your nurse obviously had not given those types of shots before or she would have been more careful, especially since the sciatic nerve is so sensitive. Please send this on to the appropriate party who handles these things because I'm sure I am not the only one to receive a bad injection."

¶ 15    When asked in her deposition about her pain following the injection, plaintiff testified:

"It was just like weird. Because I got the shot and then suddenly I'm paralyzed. I mean, I think most normal human beings would put the two together."

And when asked if she believed her pain was "wrongfully caused" by the nurse who administered the injection at Diamond Headache, plaintiff testified:

"I mean, it was my best guess, because I get the injection, then I'm paralyzed. So it's kind of like cause and effect. But I don't know for sure, because I have doctors telling me this is impossible. So, you know, you have to trust your doctor too."[1]

¶ 16    On August 4, 2016, plaintiff again presented to the emergency room at Delnor Hospital, where she complained of left leg pain, paralysis, and difficulty ambulating. Physical examinations and magnetic resonance imaging (MRI) showed that plaintiff was suffering from "nonspecific left sciatic nerve inflammation." Plaintiff was diagnosed with sciatic neuritis and was discharged a few days later, on August 7, 2016.

¶ 17    On August 9, 2016, plaintiff emailed Diamond Headache's Chief Operating and Chief Financial Officer, Konrad Kothmann, stating:

"I was just released after 4 days in the hospital after another ER visit which included two MRIs and I have physical therapy coming up and will miss a total of 14 days of work. This is a huge financial loss for me and since it was caused by negligence I was hoping to have some form of resolution."

While Mr. Kothmann recalled receiving plaintiff's email, he did not recall having any direct communications with her concerning her injury.

¶ 18    In any event, on August 11, 2016, PA Tymouch from Diamond Headache noted that she spoke to plaintiff regarding her July 22, 2016, Methadone injection:

"I explained to Joyce, that mechanical injury to peripheral nerves can happen with IM injections; usually heal without any permanent damage or residual [symptoms] within a few weeks. To minimize the risk of nerve injury, IM injection is administered in upper

---

[1]The record does not reveal that any doctor informed plaintiff it was "impossible" that her injury was caused by the injection; rather, plaintiff alleged that a non-medical agent of defendants told her it was "impossible" that the injection caused her injury, as will be discussed below.

outer quadrant of right or left buttock (a common practice at our clinic). With this

technique, it is highly unlikely that sciatic nerve can be injured; however, slight anatomic

variations of human body are possible and not uncommon. Unfortunately, there is no way

to see/feel the nerves to completely avoid mechanical injury of peripheral nerve while

administering IM injections."

Despite the foregoing, plaintiff continued to receive treatment from Diamond Headache until

November 2017.[2]

¶ 19　　On August 6, 2018, more than two years after she received the Methadone injection,

plaintiff filed a single-count negligence complaint against defendants and PA Tymouch.

Defendants and PA Tymouch subsequently moved to dismiss plaintiff's complaint on the basis

that it was time-barred by the applicable statute of limitations because plaintiff filed the

complaint more than two years after she received the Methadone injection. The circuit court

entered and continued the dismissal motion, and granted, over defendants' and PA Tymouch's

objection, plaintiff leave to amend her complaint.

¶ 20　　Plaintiff then filed a first amended complaint against defendants and PA Tymouch,

alleging, in the main, that their negligence in administering the Methadone injection into the

wrong location of her body (*i.e.*, her sciatic nerve) was the direct and proximate cause of her

injury. Defendants and PA Tymouch again moved to dismiss plaintiff's first amended complaint,

asserting there was no dispute that the alleged negligence occurred on July 22, 2016, more than

two years before plaintiff filed her initial complaint against them. Defendants further asserted

_____

[2]In her deposition, plaintiff stated that she continued to get Methadone injections at Diamond Headache after the July 22, 2016, injection; however, plaintiff did not expand upon that testimony, so it is unclear as to how many Methadone injections she received or how often she received them after July 22, 2016. Plaintiff testified that she stopped going to Diamond Headache in 2017 because it was too far away from her home.

that the discovery rule, which delays commencement of the two-year limitations period, did not apply because plaintiff's medical records and the emails she sent to Diamond Headache all established that she knew of her alleged injury on July 22, 2016, and believed that it was wrongfully caused. Plaintiff replied that questions of fact existed concerning the timeliness of her complaint, and furthermore, that she received multiple assurances from medical providers and Diamond Headache that her injury was not the result of medical negligence or any wrongdoing by the clinic.

¶ 21    The circuit court denied defendants' and PA Tymouch's dismissal motion without prejudice, in order to allow plaintiff to clarify, in a deposition, what she meant when she referred to "negligence" in her emails to Diamond Headache. In reaching that conclusion, however, the court noted that "the motion [was] well taken" especially given plaintiff's emails to Diamond Headache in which she indicated knowledge of her injury and that it was wrongfully caused when, or shortly after, she received the Methadone injection.

¶ 22    In December 2019, plaintiff filed a second amended complaint against defendants, PA Tymouch and Shenay Watkins, a medical assistant at Diamond Headache. Plaintiff alleged, in the main, that she could not have realized she had a valid claim until August 6, 2016, two years before she filed her complaint; that she relied on many representations after August 11, 2016, by "physicians, physician assistants and nursing personnel" telling her "the [injection] was performed correctly, they did nothing wrong, and she would likely recover." Plaintiff further alleged that "[a]t no time prior to August 6, 2016 did [she] know nor should she have known that the conduct of [d]efendants wrongfully caused any of her symptoms which arose between July 22, 2016 and August 6, 2016."

¶ 23    The next year, plaintiff voluntarily dismissed PA Tymouch and Assistant Watkins as defendant parties to the suit, leaving only the defendants to this appeal as party defendants.

¶ 24    In July 2022, defendants moved for summary judgment, asserting that plaintiff's negligence claim against them was time-barred by the two-year statute of limitations period. In their motion, defendants argued there were no questions of fact because plaintiff's deposition testimony, along with the documentary evidence in this case, established that plaintiff knew or should have known of her injury and that it may have been wrongfully caused on the date she received the Methadone injection (*i.e.*, July 22, 2016). Specifically, plaintiff testified that the injection was unusually painful compared to those she had received in the past at Diamond Headache, and that, within hours, she was temporarily paralyzed and unable to walk. In addition, plaintiff emailed Diamond Headache on August 2, 2016, seeking compensation for her injury based on her belief that the injection was negligently administered by an "inexperienced nurse" and plaintiff's opinion that her post-injection pain was related to her sciatic nerve.

¶ 25    In response, plaintiff argued there existed questions of fact precluding summary judgment because she was given "conflicting information" and was "never informed [that] her injection was wrongfully caused." As to PA Frazer's statement that plaintiff's injury likely resulted from the injection hitting her sciatic nerve, plaintiff argued this raised only a mere suspicion that her injury was wrongfully caused. In other words, PA Frazer's statement did not rise to level that would convince someone to investigate further. Moreover, plaintiff argued that her sciatic diagnosis was not enough for her to connect the Methadone injection to her injury.

¶ 26    Defendants replied, among other things, that plaintiff was never told by any medical provider that her symptoms were unrelated to the July 22, 2016, Methadone injection. Rather, plaintiff was told by PA Tymouch that her peripheral nerves could have been injured by an

intramuscular injection. While plaintiff claimed that Mr. Kothmann advised her that it was "impossible" that her sciatic nerve was injured from the injection, Mr. Kothmann testified that he is not a medical professional and does not speak to patients about clinical care.

¶ 27   The circuit court ultimately agreed with defendants that plaintiff's claim was time-barred and granted their summary judgment motion on December 30, 2022. In reaching its conclusion, the court stated:

> "The essential facts of injury and causation in the record establish that this is one of the exceptional instances in which determining the expiration of the statute of limitations is a question of law. This is an inexorable conclusion based on the timeline of events and [plaintiff's] own testimony. In short, the questions of fact this court previously had when it considered the defendants' motion to dismiss have been answered.
>
> It is plain from the record that [plaintiff] knew of her injury and that it was wrongfully caused on the date of the occurrence. [Plaintiff] testified that the intramuscular injection she received on July 22, 2016 was very painful and caused her to scream. No previous injection had felt like that. [Plaintiff's] description of the pain she felt from the injection makes plain that her injury was traumatic."

The court also noted that plaintiff was told by several medical providers that the injection likely irritated her sciatic nerve and that an MRI "provided objective findings of left sciatic nerve inflammation and fluid and edema in the fascial plane containing the sciatic nerve." Thus, "[plaintiff] cannot avoid the conclusion that these objective findings confirm that [plaintiff's] traumatic injury occurred on July 22, 2016."

¶ 28    Moreover, regarding Mr. Kothmann's alleged statement that it was "impossible" that the injection could have caused plaintiff's injury, the court concluded this did not implicate estoppel, stating:

"The issue is not whether Kothmann's statement provided [plaintiff] with a sense of reassurance that would toll the running of the two-year statute of limitations; rather, the point is that Kothmann's statement does not absolve [plaintiff] from her duty to seek out the cause of her traumatic injury. Indeed, even if Kothmann told [plaintiff] the injection had nothing to do with her symptoms, [plaintiff] still had the burden of inquiry based on her previous objective belief that the July 22, 2016 injection had caused her continuing pain. As a side note, Kothmann testified that he has no recollection of speaking with [plaintiff] and that, as a non-medical provider, does not speak with patients other than as to billing and collection issues."

The court therefore rejected plaintiff's argument that defendants were equitably estopped from raising a limitations defense.

¶ 29    In sum, the court noted: "[t]he inescapable fact is that [plaintiff] received a traumatic injury that she nearly immediately identified as the source of her continuing symptoms. To allow [plaintiff] to file her complaint after the running of the two-year statute of limitations would run directly counter to the statute and common law." The court granted defendants' summary judgment motion, and plaintiff appealed.

¶ 30                                II. ANALYSIS

¶ 31    Summary judgment should be granted when the pleadings, affidavits, depositions and admissions on file, construed strictly against the moving parties, reveal no genuine issue of material fact so that the movants are entitled to judgment as a matter of law. 735 ILCS 5/2-

1005(c) (West 2016); *Berke v. Manilow*, 2016 IL App (1st) 150397, ¶ 31. While a nonmoving party need not prove her case at the summary judgment stage, she must present some evidence that would arguably entitle her to recovery at trial. *Manilow*, 2016 IL App (1st) 150397, ¶ 31. We review the circuit court's summary judgment ruling *de novo*. *Id*. Moreover, we may affirm the lower court's grant of summary judgment on any basis appearing in the record, regardless of whether the court relied on that basis or whether its reasoning was correct. *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 34.

¶ 32                                    A. Discovery Rule

¶ 33     In general, a cause of action for personal injuries accrues when the plaintiff suffers an injury. *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 360 (1995). While, historically, the limitations period was not tolled even if the plaintiff was unaware of the existence of an injury, the judiciary eventually created the "discovery rule" to alleviate the harsh consequences that would flow from such a literal application of the limitations period. *Id*. The discovery rule postpones the commencement of the applicable statute of limitations until the injured plaintiff knows or reasonably should know that she has been injured and that her injury was wrongfully caused. *Id*. at 360-61. As will be discussed more below, an exception to the application of the discovery rule arises, where, as here, the plaintiff's injuries are caused by a sudden, traumatic event. *Id*. at 361. In that case, "the [plaintiff's] cause of action accrues, and the statute of limitations begins to run, on the date the injury occurs." *Id*. at 362.

¶ 34     With that in mind, section 13-212(a) of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/13-212(a) (West 2016)) provides, as relevant here, that any negligence claim for damages for injury or death against any physician, registered nurse or hospital duly licensed under Illinois law must be filed within two years of "the date on which the claimant knew, or

through the use of reasonable diligence should have known, or received notice in writing of the existence of the injury or death for which damages are sought in the action."

¶ 35    In the context of the discovery rule, the statute starts to run when a person knows or reasonably should know of her injury and knows or reasonably should know that it was wrongfully caused. *Witherell v. Weimer*, 85 Ill. 2d 146, 156 (1981). This also means that "[o]nce the party knows or reasonably should have known both that an injury occurred and that it was wrongfully caused, the party is obligated to inquire further as to the existence of a cause of action." *Young v. McKiegue*, 303 Ill. App. 3d 380, 387 (1999). The term "wrongfully caused" does not mean the person knows of a specific defendant's negligent act or knows that an actionable wrong was committed; rather, a person knows or reasonably should know that an injury is "wrongfully caused" when she "possesses 'sufficient information concerning [an] injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved.' " *Hoffman v. Orthopedic Systems, Inc.*, 327 Ill. App. 3d 1004, 1011 (2002) (quoting *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 416 (1981)); see also *Castello v. Kalis*, 352 Ill. App. 3d 736, 745 (2004) ("The limitations period begins to run when the plaintiff becomes aware that the cause of h[er] problem stems from another's negligence and not from natural causes" (Internal quotation marks omitted.)).

¶ 36    While, typically, the question of when a party knew of her injury and that it was wrongfully caused is one of fact, where, as here, it is apparent from the undisputed facts that only one conclusion can be drawn, the question becomes one for the court and can be resolved as a matter of law, making summary judgment based on the statute of limitations appropriate. *Castello v. Kalis*, 352 Ill. App. 3d 736, 744 (2004); see also *Ikenn v. Northwestern Memorial Hospital*, 73 Ill. App. 3d 694, 699 (1979) ("While we are of the opinion that the questions of

knowledge and causation are ordinarily questions for the trier of fact, we note that there are situations where it is clear that a plaintiff knew or should have known of injury and causation, in which event they would be matters of law to be decided by the trial court.").

¶ 37    As previously stated, plaintiff argues that the circuit court erroneously granted summary judgment to defendants because there were questions of fact as to whether plaintiff knew that she was injured and whether the injury was wrongfully caused before August 6, 2016 (two years before she filed her complaint). We disagree. Here, as set forth above, plaintiff received a routine Methadone injection at Diamond Headache on July 22, 2016. Unlike all her prior injections at the clinic, this one "hurt so bad" that plaintiff "screamed." Plaintiff described the incident, testifying that the injection "was very, very painful" and that it "never felt like that before." As usual, plaintiff's husband drove her home from the clinic after she received the Methadone injection that day. When they arrived home, however, plaintiff was unable to walk. When plaintiff tried to walk, she fell, injuring her head and leg. Plaintiff testified that she "was completely paralyzed on the left side from the hip down." Although plaintiff regained some feeling in her leg over the next couple days, she claimed it still felt very painful, leading her to see her primary care physician on July 25, 2016.

¶ 38    At the primary care visit, PA Frazer noted that plaintiff had "inflammation from the injection site hitting her sciatic nerve" and that "[plaintiff] is very thin *** so [her sciatic nerve] could have easily been irritated by the injection." PA Frazer then ruled out DVT after ordering an MRI for plaintiff. Four days later, plaintiff again saw PA Frazer for left leg pain. Plaintiff claimed she was unable to "scrunch her toes" on the left side. PA Frazer diagnosed plaintiff with sciatic nerve neuritis, noting that she believed plaintiff suffered from "irritation to [her] Sciatic Nerve from the injection."

¶ 39    Nevertheless, a few days later on July 31, 2016, plaintiff presented to the emergency room at Delnor Hospital for lower leg pain. Plaintiff's intake notes indicated that she "had an injection on 7/22/16 and feels that it may [have] been close to the sciatic nerve as within the next 2 days she developed pain down the posterior aspect of her left leg." Plaintiff was eventually diagnosed with sciatica and was discharged from the hospital that day.

¶ 40    The foregoing shows that plaintiff knew or reasonably should have known that her injury occurred when she received the injection on July 22, 2016. At the very least, plaintiff reasonably should have known of her injury in the following days, before August 6, 2016, since both PA Frazer and Delnor Hospital medical staff diagnosed her with a sciatic nerve injury that, in all likelihood, stemmed from the injection.

¶ 41    Furthermore, plaintiff's August 2, 2016, email to PA Tymouch at Diamond Headache indicated that she knew her injury was wrongfully caused. In her email to PA Tymouch, plaintiff stated that her Methadone injection was administered by "an apparently inexperienced nurse who put the needle in [her] sciatic nerve." Plaintiff further stated that she "was aware that the shot was more painful than usual as soon as the shot was administered but [she] didn't connect that *the pain was coming from the sciatic nerve until we got home an hour later* and [her] husband had to literally carry [her] out of the car and into the house because [her] foot and leg were paralyzed on the left side (which is where [she] received the shot)." (Emphasis added.). The plain language of this email shows that plaintiff not only was aware that her sciatic nerve was injured right after she received the injection, but also that she knew it was wrongfully caused by an "inexperienced" nurse at Diamond Headache who administered the Methadone injection into "[her] sciatic nerve."

¶ 42     Accordingly, we conclude that the discovery rule did not apply to delay the start of the limitations period in this case. *Cf. Dockery v. Ortiz*, 185 Ill. App. 3d 296 (1989) (unlike the plaintiff in *Dockery*, who had a history of vascular disease and diabetes and was not aware of the defendants' negligence at the time his legs were amputated, plaintiff here assuredly believed that she was mistreated when she received the injection on July 22, 2016); *Gara v. Semerad*, 183 Ill. App. 3d 622 (1989) (unlike the plaintiff in *Gara*, who kept switching doctors because none of them were able to find anything wrong with her despite her constant pain, plaintiff here was told by PA Tymouch, PA Frazer, and medical providers at Delnor Hospital that she had a sciatic injury that could have been caused by the Methadone injection).

¶ 43     Even assuming, *arguendo*, that the discovery rule applied, the statute of limitations period was still triggered when plaintiff received the Methadone injection on July 22, 2016, because the injury was "traumatic" in nature. A "traumatic injury" is an injury where the damage is caused by external violence, or, as relevant here, which is immediate and caused by an external force. *Clark v. Galen Hospital Illinois, Inc.*, 322 Ill. App. 3d 64, 69 (2001). In the instant case, it is clear from plaintiff's description of the severity of her condition immediately following the Methadone injection in both her deposition testimony and emails to Diamond Headache that her injury was occasioned by a traumatic event and that she knew of this injury more than two years prior to the filing of her complaint.

¶ 44     For example, plaintiff in her email to PA Tymouch claimed that, after she got home from the clinic, her husband "had to literally carry [her] out of the car and into the house because [her] foot and leg were paralyzed on the left side (which is where [she] received the shot)." This type of sudden, extreme injury immediately following the Methadone injection was the type of injury that imparted constructive knowledge on plaintiff that her injury was the result of a traumatic

event by another's wrongful conduct. *Cf. Warren v. Burris*, 325 Ill. App. 3d 599, 604-05 (2001) (unlike the plaintiff in *Warren*, whose injury was "not as readily apparent as those resulting from traumatic events" since what he "was experiencing could have been the result of natural causes absent a negligent cause" and "none of the doctors that examined [him] could determine the cause of his symptoms," plaintiff here knew she was injured, at the latest, when she arrived home and could not walk and was subsequently diagnosed by various medical providers with a sciatic injury). Moreover, plaintiff indicated she knew of her injury and that it was wrongfully caused when she presented to her primary care physician and Delnor Hospital in the days following her Methadone injection, more than two years before she filed her complaint in this matter. For these reasons, and those set forth above, we conclude that the circuit court correctly found the discovery rule did not apply, and even if it did, that plaintiff's injury was traumatic; thus, the limitations period began to run when plaintiff received the injection at Diamond Headache on July 22, 2016.

¶ 45                              B. Equitable Estoppel

¶ 46    Plaintiff argues that, even if she should have known of her injury prior to August 6, 2016 (two years before she filed her complaint), defendants were equitably estopped from asserting a limitations defense because one of their agents (Mr. Kothmann) assured her it was "impossible" that the Methadone injection could have caused her injury. It is well settled that defendants are equitably estopped from raising a statute of limitations defense when the defendants "undertook affirmative acts that lulled the plaintiff into a false sense of security that the limitations defense would not be raised." *Pack v. Santa Fe Park Enterprises, Inc.*, 209 Ill. App. 3d 648, 652 (1991). While equitable estoppel, ordinarily, is a question of fact for the jury to decide, the question is properly decided as a matter of law when the facts are undisputed and reasonable persons could

not differ as to the inferences to be drawn from the facts presented. *Id.* Additionally, the party claiming estoppel has the burden of ultimately proving it by clear and unequivocal evidence. *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 314 (2001).

¶ 47    To establish equitable estoppel, plaintiff here had to demonstrate that: (1) defendants undertook words or conduct that amounted to a misrepresentation or concealment of material fact; (2) defendants knew, or had reason to know, the falsity of their misrepresentation or concealment; (3) plaintiff did not know, or have reason to know, that defendants' misrepresentation or concealment was false; (4) defendants intended, or reasonably expected, that plaintiff would detrimentally rely on their misrepresentation or concealment; (5) plaintiff's detrimental reliance was reasonable and in good faith; and that (6) plaintiff would be prejudiced if defendants were permitted to avoid the falsity of their misrepresentation or concealment. *Id.* at 313-14; *Pack*, 209 Ill. App. 3d at 652. Although plaintiff did not need to prove her claim of equitable estoppel by clear and convincing evidence to survive summary judgment, she had to present some factual basis that would arguably entitle her to recovery at trial. *Falcon Funding, LLC v. City of Elgin*, 399 Ill. App. 3d 142, 159 (2010).

¶ 48    Applying these elements to the case at bar, we cannot say that defendants were equitably estopped from raising a statute of limitations defense. Initially, plaintiff claimed that Mr. Kothmann told her it was "impossible" that the injection could have caused her injury, but Mr. Kothmann had no recollection of making any such statement to plaintiff. While this could have arguably raised a question of fact as to whether the alleged statement was actually made by an agent of defendants, none of the other estoppel elements were satisfied to support plaintiff's claim.

¶ 49    The record before us shows that Mr. Kothmann did not remember making any assurances to plaintiff regarding the cause of her injury, that plaintiff had reason to know that Mr. Kothmann's alleged statement was false since PA Frazer and medical providers at Delnor Hospital diagnosed plaintiff with a sciatic injury and told her that it could have been caused by the injection, and that defendants did not intend or reasonably expect plaintiff to detrimentally rely on Mr. Kothmann's purported statement since he did not even recall making it. Moreover, nothing in the record established that plaintiff relied on Mr. Kothmann's alleged statement since she visited other medical providers in the days following her Methadone injection. Finally, plaintiff did not show that she would have been prejudiced if defendants were allowed to avoid the falsity of Mr. Kothmann's supposed statement since, as set forth above, there was overwhelming evidence presented to the court below that plaintiff was aware of her injury and that it was wrongfully caused when, or shortly after, she received the injection. *Cf. Witherell*, 85 Ill. 2d at 158-60 (where one of the plaintiff's doctors constantly reassured her that her injuries stemmed from a muscle condition, not birth control pills, and convinced her to resume taking the pills after she voluntarily quit, the court held that the defendant doctors were estopped from asserting a limitations defense).

¶ 50    Based on the foregoing, we conclude that plaintiff did not meet her burden of presenting a sufficient factual basis that would arguably entitle her to recovery at trial because she fell manifestly short of establishing the estoppel elements. Accordingly, the circuit court properly entered summary judgment in favor of defendants.

¶ 51                                    III. CONCLUSION

¶ 52    For the reasons set forth above, we affirm the circuit court's judgment.

¶ 53    Affirmed.