HARDEN CHEVROLET CO., PLAINTIFF, *v.* PICKAWAY GRAIN CO., DEFENDANT.

Common Pleas Court, Pickaway County.

No. 22935.   Decided March 20, 1961.

162

*Mr. J. W. Adkins, Jr.*, for plaintiff.
*Mr. Tom A. Renick*, for defendant.

AMMER, J. This is an action filed against the defendant corporation seeking a permanent injunction as well as damages relative to defendant discharging particles of grain husks into the air in their operation of drying corn and grain.

The defense interposed herein is one that the defendant

corporation has operated said business for many years at this location and that such operation is in accordance with law and the plaintiff corporation moved into the area fully aware of the business carried on by the defendant corporation and therefore the plaintiff is not entitled to the relief sought.

The facts herein indicate that the defendant corporation is engaged in the business of purchasing, selling and storing grains grown by farmers in the area. The defendant corporation secured its present location for a grain elevator in 1923 and since 1894 the same general type of business has been carried on at this location. In the entire operating history of this business it has been customary to shell ear corn in the plant and that by reason thereof small flakes of the corn cobs known as "bees wings" have been thrown out in to the atmosphere and the same have collected on surrounding properties in the area depending upon the direction and velocity of the prevailing wind.

It further appears the area in which the defendant's elevator is located has always been an industrial area. That it has been the custom of the defendant to burn the cobs from which the corn is shelled in a cob burner located on defendant's premises. The present cob burner was erected in 1948 and has been used since then up to the present time. This cob burner apparently is effective when kept in proper repair annually. This cob burner is approved by the insurance underwriters and the State Fire Marshal's office. When the cob burner is in operation it will emit small particles of unburned cob into the air, this being often referred to as "fly ash." It appears that such particles of "fly ash" is a condition prevalent to the operation of a cob burner.

In 1958 the defendant undertook a program to attempt to control the emission of "bees wings" and spent a considerable amount of money for that purpose. Certain changes were made in the grain dryers at that time by installing an additional fan and adding filters directing all the "bees wings" out of a large duct work approximately 20 feet above the ground level rather than permitting the "bees wings" to be expelled from the top of the elevator some 65 feet above the level when they installed the grain dryers in 1947.

The evidence further indicated that the plaintiff prior to locating its place of business at its present site had its used car lot and buildings on a site in the immediate neighborhood of and closer to the defendant's plant than the site now occupied by the plaintiff. It further appears that plaintiff has been familiar with this type of operation carried on by the defendant. Witnesses testified who are either owners or employees of businesses in the immediate area of defendant's elevator, one operating a lumber company, another a filling station, another a Farm Bureau Co-operative Store and another a Dairy Co-operative. These witnesses testified of being familiar with the emission of "bees wings" and "fly ash" in the air during corn harvesting season. Mr. Ralph Ankrom who is associated with a lumber business in the area testified that their business was about a hundred yards from the elevator and he had noticed more "bees wings" in the area the past year than had been prevalent for the previous ten years and that these cover the cars in the area. He stated they had no effect upon their lumber business. Joe Jenkins, a service station operator stated it does appear there had been more "bees wings" this year due to the wind being from a different direction. Orwin Drum, manager of the Farm Bureau Co-op stated that there is an emission of "bees wings" that accumulates on their building but this does not hurt the paint. Russell Palm, manager of the Pickaway Dairy in the immediate area stated their plant had been located since 1938 there and that they receive some of the "bees wings" around the dairy but no more than previously but primarily depends upon the direction of the wind. Russell Congrove, operator of a filling station and car wash stated that he has noticed "fly ash" and "bees wings" on cars which he washed for the plaintiff during October, 1960, and it was necessary to use soap to get such material off the cars. It does not appear that such material in any way damages the finish on the cars.

Ned W. Harden, president of defendant corporation, testified that he is in the business of selling new and used cars in the area near defendant's elevator, stating their present building had been located there since August, 1957. He stated that they had not noticed the emission of "bees wings" and "fly ash" until about a year and a half ago when the amount increased at cer-

tain times depending upon the direction of the wind. He states the accumulation of "fly ash" and "bees wings" on the cars will have a detrimental effect as to the sale of cars and this also results in the necessity of washing the cars almost daily in order to keep them presentable for sale. He testified their used car lot was previously located west of the elevator and that he has been cognizant of the fact that the area around the elevator has been industrial for many years. He further testified that he could not say he had a direct loss in sales for cars due to this condition but if this continued it will be necessary to move to a different location.

Gerald M. Arnold, Fire Prevention Inspector for an insurance underwriting company stated that he had inspected defendant's elevator and cob burner and found them to be of standard construction, that the physical properties were approved and acceptable. He stated that the equipment is not defective and that the industry has failed to find any solution relative to the controlling of "bees wings." He testified that a stainless steel screen could be purchased to be placed on top of the cob burner which would improve considerably the operation by reducing the amount of "fly ash" emitted into the air.

Richard Bowers, manager of defendant corporation since 1958 stated that the elevator was established in 1894 and that in 1959 there was 1,080,000 bushels of corn handled through the plant and that approximately $1,500,000.00 had been paid to farmers by the elevator. He stated they have a payroll of $88,000.00 yearly and sales amounted to about $1,800,000.00. He stated that less corn is shelled at the elevator now due to the fact more is shelled in the field. He further stated that the cob burner had been built in 1946 in accordance with fire regulations and that wet cobs give off more "fly ash." He was of the opinion that the amount of "fly ash" that is emitted now is the same as has been for the last two or three years but the wind may determine the accumulation in a particular area. He stated in this area also much dirt is noticeable from the railroads hauling coal which pass near the elevator.

This is an action for an injunction with a request for damages being incidental to the main relief sought. In view of that fact the parties were not entitled to a jury trial and the matter was submitted to the Court for determination. See *Converse* v.

*Hawkins*, 31 Ohio St., 209 and *Rolland* v. *Entrekin et al.*, 27 Ohio St., 47.

A nuisance is anything which annoys or gives trouble or vexation and which is offensive or obnoxious or works hurt, inconvenience or damage to another. It has also been defined as anything wrongfully done or permitted which injures or annoys another in the enjoyment of his legal rights. See 41 Ohio Jurisprudence (2d), page 92.

In the main nuisances may be classified in the following ways, private and public depending upon the number of persons affected. If a person so used his property to damage another person's property or disturb his quiet enjoyment of it a private nuisance exists. If a whole community is annoyed or inconvenienced by an offensive act, a public or common nuisance exists. 41 Ohio Jurisprudence (2d), 93.

In this case there are various businesses and persons in the immediate elevator area but none seemed to have been adversely affected except the defendant corporation and therefore if a nuisance does exist in this case it is a private nuisance.

The rule of equity to entitle a party to an injunction requires that his rights must be clear and Courts will not exercise extraordinary authority when the right is doubtful or facts are not definitely asserted. This is fully applicable in cases where injunctions are sought against nuisances. In such cases the right to such relief must be clearly made out. The nuisance must be clearly established and the legal right of the complaining party in regard to injury must be shown to have been affected by the nuisance and to a substantial or material degree. A court of equity will not enjoin something as a nuisance where the injury therefrom is doubtful or contingent, or trifling or imaginary, nor is there a right to equitable relief where the injury is not irreparable and there exists an adequate remedy at law. See 41 Ohio Jurisprudence (2d), 146, 147.

In 39 American Jurisprudence, 471, the following is stated:

"It is true, as a general proposition, that one who voluntarily places himself in a situation whereby he suffers an injury will not be heard to say that his damage is due to a nuisance maintained by another, a principle which is expressed by the maxim "volenti non fit injuria." The test of liability here, as in other situations, is the knowledge of the plaintiff respect-

ing the consequences of his conduct. If it appears that he foresaw or might have foreseen the injury of which he complains, he will not be granted the relief which he prays; and conversely, if he cannot be said to have had actual or constructive knowledge of the injurious instrumentality or condition he will not be barred of recovery for having failed to take measures to avoid injury. So, as a rule, one who consents to, permits, encourages, or acquiesces in the erection of a structure with knowledge of the purposes for which it is to be used cannot afterward complain of it as a nuisance. According to the weight of authority, however, the fact that a person voluntarily comes to a nuisance by moving into the sphere of its injurious effect after its creation will not deprive him of his right to injunctive relief or damages.

"As a rule, it is no justification for maintaining a nuisance that the party complaining of it came voluntarily within its reach. Thus, according to the weight of authority the fact that a person voluntarily comes to a nuisance by moving into the sphere of its injurious effect, or by purchasing adjoining property or erecting a residence or building in the vicinity after the nuisance is created, does not prevent him of the right to enjoin its maintenance, especially where, by reason of changes in the structure or business complained of, the annoyance has since been increased. And the renewal by a tenant of his lease after the creation by a third person of a nuisance by his method of conducting his business, injuriously affecting the right of occupancy and the tenant's private property, does not preclude the tenant from maintaining an action to abate the nuisance and recover damages. But while priority of occupation is not conclusive to the existence of a nuisance, it is to be considered with all the evidence, and the inference drawn from all the facts proved, in determining whether the use of the property is unreasonable.

"It has been held that injunction will not lie to banish business from a city block at the instance of persons investing in unrestricted property after the business was established. But the fact that one purchases a home in a manufacturing district with property adjoining that may be improved for manufacturing purposes does not prevent his insisting that any such improvement shall be made with due regard to his rights as a

dweller in a manufacturing district. There is a conflict of authority on the question of whether a suit may be maintained on the theory of nuisance by one who locates near a place already existing for the storage of explosives.''

In the case of *Antonik* v. *Chamberlain*, 81 Ohio App., 465, the Court stated the following:

''Nuisance, in law, for the most part consists in so using one's property as to injure the land or some incorporeal right of one's neighbor. An act which is wrongful in itself may be adjudged wrongful before it is committed, as well as afterwards. But an act which is in itself rightful, and may become wrongful only because of some effect which it produces, is generally not proved wrongful by a prior reasoning. Even when it appears that a given act or acts done in a certain way are wrongful, it does not follow that some part of the act or acts may not be rightfully done, or even that the entire operation may not be later done in such a way as to be rightful. It is often found that the damage to the defendant which the interference of a court, through injunction, would cause, will be out of all proportion to the damage to the plaintiff or to the public in general.

''The law of nuisance plys between two antithetical extremes: the principle that every person is entitled to use his property for any purpose that he sees fit, and the opposing principle that everyone is bound to use his property in such a manner as not to injure the property or rights of his neighbor. For generations, courts, in their tasks of judging, have ruled on these extremes according to the wisdom of the day, and many have recognized that the contemporary view of public policy shifts from generation to generation.

''In our business of judging in this case, while sitting as a court of equity, we must not only weigh the conflict of interests between the airport owner and the nearby landowners, but we must further recognize the public policy of the generation in which we live. We must recognize that the establishment of an airport of the kind contemplated is of great concern to the public, and if such an airport is abated, or its establishment prevented, the consequences will be not only a serious injury to the owner of the port property but may be a serious loss of a valuable asset to the entire community.

"The question for decision is not simply whether the neighbor is annoyed or disturbed, but is whether there is an injury to a legal right of the neighbor. The law of private nuisance is a law of degree; it generally turns on the factual question whether the use to which the property is put is a reasonable use under the circumstances, and whether there is an appreciable, substantial, tangible injury resulting in actual material, physical discomfort, and not merely a tendency to injury. It must be real and not fanciful or imaginary, or such as results merely in a trifling annoyance, inconvenience, or discomfort. 39 American Jurisprudence, Sec. 30 and *Eller* v. *Koehler*, 68 Ohio St., 51. It is not everything in the nature of a nuisance which is prohibited. There are many acts which the owner of land may lawfully do, although it brings annoyance, discomfort or injury to his neighbor, which are damnum absque injuria. * * *

"* * * The test of the permissible use of one's own land is not whether the use or the act causes injury to his neighbor's property, or that the injury was the natural consequence, or that the act is in the nature of a nuisance, but the inquiry is, was the act or use a reasonable exercise of the dominion which the owner of property has by virtue of his ownership over his property, having regard to all interests affected, his own and those of his neighbors, and having in view also public policy. *Booth* v. *Rome, W. & O. Terminal Rd. Co.*, 140 N. Y., 267."

In determining injunctive relief an important consideration is that of surrounding circumstances. In 41 Ohio Jurisprudence (2d), 151 to 154, the following is set forth:

"Since a court to which application is made for equitable relief will determine each case, as it arises, upon its own facts and circumstances, and since the question of whether it will award such relief rests in the sound discretion of the court, various matters are considered by courts of equity in determining whether a particular factory, plant, business, or concern, or a particular process or method of operation used by such a concern, will be restrained. The court will consider such matters as the legality and necessity of the business, the nature of the operations, processes, or instrumentalities causing the nuisance, the location of the plant or business and the character of the district or neighborhood in which it is located, who oc-

cupied the territory first, the time of day or night at which the disturbance or annoyance is caused, the number of persons employed, the value of the plant, the amount of its payroll, whether there is an injury to property or an injury to the health or comfort of persons, the degree and extent of injury to the plaintiff, and the comparative injuries to the plaintiff if the nuisance is not restrained and to the defendant if it is. The fact that a manufacturing plant has abated conditions which constituted a nuisance at a former time may also be considered.

"According to the surrounding circumstances, a court of equity may or may not enjoin the establishment or operation of a business in a residential district. If a person becomes a resident of a trading or manufacturing neighborhood, or remains there while, in the march of events, such a district gradually becomes a trading or manufacturing neighborhood, the recognized rule is that he is bound to submit to the ordinary annoyances, discomforts, and injuries which are merely incidental to the reasonable and general conduct of such business. But even though persons located in a manufacturing district, are at law, bound to submit to certain handicaps to their property rights by virtue of such location they have legal rights which a court of equity will protect. A nisi prius court has said that it is not prepared to say that because a defendant's plant is located in a manufacturing district, the defendant is at liberty, without limitation, unreasonably and substantially to cause vibration on a person's premises."

In the case of *Oetjen* v. *Goff-Kirby Co.*, 38 Ohio Law Abs., 117, the Court of Appeals of Cuyahoga County set forth the following principle:

"A purchaser of apartments near a coal yard who previous to purchase inspected them and the coal yard, should have reasonably anticipated the injury from coal dust charged and is not entitled to any relief either by way of injunction or damages where there has been no material change since the purchase in the method or manner of handling coal, the quantities of coal handled, or the amount of coal dust arising from the operation."

The Court further stated at page 123:

"The general rule applicable to the rights of persons such as plaintiff, acquiring property affected by a then existing nuisance, is set forth in 20 R. C. L., page 495, as follows:

"It is true as a general proposition, that one who voluntarily places himself in a situation whereby he suffers an injury will not be heard to say that his damage is due to a nuisance maintained by another, a principle which is expressed by the maxim volenti non fit injuria. The test of liability here, as in other situations, is the knowledge of the plaintiff respecting the consequences of his conduct. If it appears that he foresaw or might have foreseen the injury of which he complains, he will not be granted the relief which he prays."

One of the leading cases on nuisances is that of *Eller* v. *Koehler*, 68 Ohio St., 51, in which the Court at page 56 set forth the following principle:

"The matter of locality may be of much or little weight in arriving at a conclusion, nevertheless the parties have the right to have the controversy heard and determined with all the light that locality may throw upon it. The mutual interests of urban population require this. For example, if one unnecessarily erects, maintains and operates a noisy, smoky machine shop, or rolling mill, in the midst of a section of a city or town already wholly given up to residences, possibly many of them of elaborate design and great cost, there would be less excuse for the offender in so using his own property, than if he had chosen a place which had been wholly or in part given up to trade and manufactures. All that can be required of men who engage in lawful business is that they shall regard the fitness of locality. In the residence sections of a city, business of no kind is desirable or welcome. On the other hand one who becomes a resident of a trading or manufacturing neighborhood, or who remains while in the march of events a residence district gradually becomes a trading or manufacturing neighborhood, should be held bound to submit to the ordinary annoyances, discomforts and injuries which are fairly incidental to the reasonable and general conduct of such business in his chosen neighborhood. The true rule would be that any discomfort or injury beyond this would be actionable; anything up to that point would not be actionable."

The syllabus of the case of *Stothfang* v. *The Cincinnati Aluminum Casting Co.*, 13 Ohio App., 334, reads as follows:

"Injunction will not be granted against a corporation requiring it to cease the operation of its plant, upon the ground

that noises, vibrations, gases and fumes emanating therefrom constitute a nuisance in an exclusively residential neighborhood and result in damage to plaintiff's personal and property rights, where it appears that at the time plaintiff purchased a residence the locality was, or would soon be, upon the line of demarcation between a business or manufacturing district and a residential section.

"In an action to enjoin the operation of a factory as a nuisance in a residential district, a court of equity may refuse an injunction as prayed for, and retain the case for the purpose of endeavoring to reduce or minimize the inconvenience to the neighborhood."

The Court at page 340 stated: "that the question of noise and the nuisance arising therefrom should always be considered in connection with the locality, the nature of the trade, the use of the property producing it, the time during which it exists, and its intensity and effect."

The Summit County Court of Appeals in the case of *Gruic* v. *Knight*, 15 Ohio Law Abs., 502 at page 504, stated:

"Another circumstance to be considered in determining my right to use my estate in a particular way (so far as my neighbor is concerned) is the nature of the neighborhood where our estates are located at the time my neighbor came into the neighborhood and at the time it is claimed that my use of my estate became a nuisance. My use of my estate must not be unreasonable in view of the character of the neighborhood; if the neighborhood is devoted to manufacturing purposes some of which, by the discharge of smoke, gases and odors, so affect the air over a considerable area as to make the neighborhood where my estate is located a very undesirable place of residence, the use of my estate for manufacturing purposes which in like manner affects the air of the neighborhood, may not be inappropriate or unreasonable as against my neighbor, who knowing the character of the neighborhood and the use I am making of my estate, purchases a lot adjoining my manufacturing plant and erects and with his family occupies a house on such lot. The fact that he voluntarily places himself in a situation whereby he suffers inconvenience and injury from my use of my estate, is of importance in determining whether

said use of my estate is reasonable and not injurious to such a reasonable use of his estate as he is entitled to."

In another case in the Court of Appeals of Belmont County held in *Steele* v. *The Rail & River Coal Co.*, 42 Ohio App., 228 at page 238, the following is stated:

"There is another issue reflecting directly upon the right of the plaintiff below to recover in this case, and it is this: It is averred in the answer and substantially proven that this Mine No. 6 of the coal company has been open for 50 years, and plaintiff says that they moved into the property in question in March, 1920, and purchased same in April, 1920. Therefore, she purchased and improved this home after she had occupied it and with a full knowledge of her surroundings. No doubt the purpose of locating in the hamlet of Merritt was to avail herself or her family of the benefits of this coal mine, Merritt being a small rural hamlet which probably sprang up as an incident to the operation of the mine. She was, therefore, chargeable with knowledge that the pile of culm or refuse, if not already on fire at the time, was liable to spontaneously ignite. She is, therefore, in the position of purchasing and occupying the property in question with a full knowledge that this pile of refuse was then in existence and liable to take fire without any fault upon the part of the mine operator. What, therefore, is the effect of her voluntary act in this regard.

"In 20 Ruling Case Law, 495, it is said: Previous Knowledge as Defense to Action for Injuries. It is true, as a general proposition, that one who voluntarily places himself in a situation whereby he suffers an injury will not be heard to say that this damage is due to a nuisance maintained by another, a principle which is expressed by the maxim volenti non fit injuria. The test of liability here, as in other situations, is the knowledge of the plaintiff respecting the consequences of his conduct. If it appears that he foresaw or might have foreseen the injury of which he complains, he will not be granted the relief which he prays * * * The foregoing is sustained by the strong weight of authority.

"Therefore, this claimant, sought and obtained a home or homestead in this location, charged with full knowledge of what might occur and she should not now be heard to complain."

The cases decided by the American Courts relative to the

effect of a location of a business in which the defense is that of a person "coming to a nuisance" operating as estoppel are listed in 167 A. L. R., 1364. The cases relative to the effect of location of a business are listed at page 1378.

Applying the principles noted above it is clear that the defendant has operated a grain elevator at this location for many years and that other businesses in this immediate area are not adversely affected by the operation due to the emission of "bees wings" and "fly ash" except the plaintiff in the sale of new and used cars. It is also quite clear that the plaintiff knew of this business quite sometime prior to their coming to this location and therefore was aware of the nature of defendant's operations. It is true that in 1958 there was a change made relative to the emission of the "bees wings" into the air at a lower level than had been previously but it does not appear this was of any significance as much depended upon the prevailing winds in the surrounding area as to where the "bees wings" were deposited.

It is therefore the opinion of the Court based upon the evidence presented that the use of the property by the defendant is reasonable and does not constitute a nuisance and it has not been established by the evidence that the plaintiff has suffered irreparable injury due to said operation.

It will therefore be the order of the Court that the request for an injunction be denied and that judgment be entered for the defendant as to both the question of injunctive relief and damages. Counsel for the defendant will prepare a journal entry consistent with the above ruling of the Court.

The Court might state by way of dicta that although the operation of the defendant corporation does not constitute a nuisance under the legal principles enunicated by the Court the emission into the air of "bees wings" is a matter that should be controlled. It is true there was testimony to the effect that there had been no means devised to control the emission of "bees wings" into the air, however, the Court feels that certain efforts could be made by the defendant corporation to reduce the amount of such material into the air. This could be done either by wetting down the "bees wings" and then having them hauled away at frequent intervals or by some other mechanical device where they could be collected and hauled away. It is

true that any device would not be one hundred per cent effective but that certain measures could be used to substantially reduce the amount of ''bees wings'' into the air. The Court feels that the defendant corporation will take such measures in order to reduce as much as possible the emission into the air of such material in order to improve the condition in the surrounding area.