OPINION OF THE COURT
Charles D. Wood, J.
Pursuant to the decision and order, entered June 18, 2014, the Appellate Division, Second Department reversed the findings of the Supreme Court, Westchester County (Giacomo, J.), and granted summary judgment on the issue of liability in favor of plaintiffs and against the defendant, Quaker Ridge Golf Club, Inc. (118 AD3d 833 [2d Dept 2014]). A trial was held before this court on multiple days between March 3 and March 15, 2016 on the plaintiffs’ complaint, on the issue of damages. The following constitutes the opinion, decision and order of this court. In reaching conclusions of fact and law on the issues, the court has reviewed, evaluated and considered the testimony and the exhibits in evidence (see generally Vizzari v State of New York, 184 AD2d 564 [2d Dept 1992]; Wester v State of New York, 247 AD2d 468 [2d Dept 1998]). The failure of the court to specifically mention any particular piece of evidence in this decision does not mean that it has not been considered. Further, evidence presented is not necessarily accepted at face value. Where applicable, evidence is reviewed in light of statutory criteria or other criteria defined by applicable case law, which must be considered in reaching certain conclusions of *360 law. The following is the court’s decision, stating the facts it deems essential.
Factual Background
Quaker Ridge has been operating a golf course at its current location since on or about 1918 (tr at 43, line 16; at 44, line 3). The area where the Behars’ home is located was undeveloped land with trees until their house was built in 2007, together with approximately 11 other homes by Glickenhaus-Westchester Development, Inc. According to the Behars, they sought a home in Scarsdale because of the school system (tr at 1157, lines 8-11, 18-23). They also built their home next to Quaker Ridge because “it would be quiet, that there was a quiet street to live on” (tr at 1159, lines 11-14). The Behars contracted to purchase their home from Glickenhaus in or about April 2006, and closed title on November 21, 2007. They moved in immediately thereafter (tr at 573, line 6). Up until a storm in June of 2008, “there was no significant issue with golf ball incursion” according to the Behars (tr at 587, lines 2-3; at 575, lines 10-19). That storm brought down several tall trees on the property line between the Behars’ backyard and Quaker Ridge’s property—more specifically, golf hole No. 2. Shortly thereafter, the Behars claim, “All of a sudden, we were bombarded by golf balls” (tr at 575, line 21). Later the same year and into the next year, the Behars installed an in-ground pool and patio on their property. The permit was issued on August 19, 2008, and the certificate of occupancy was issued on July 24, 2009 (tr at 647, lines 19-23). As a result of the excavation during that time period, the plaintiffs were unable to use their backyard (tr at 811, line 4). The Behars investigated various netting and fencing options, and installed a 25-foot-high retractable net in 2009, but received a violation from the Village of Scarsdale, dated September 2, 2009 (exhibit 17), and were required to remove it.
Subsequently, Quaker Ridge sought Village of Scarsdale approval for a 40-foot-high net to prevent golf balls from leaving its property and entering the Behar property. The Village approved the 40-foot net on October 27, 2010. In the spring of 2011, the Behars installed a group of 42- to 46-foot-high Norway spruce trees (tr at 620, line 23). They claim that the golf ball problem continued unabated from June 2008 until the Second Department’s injunction was issued in June 2014.
In response to the ruling of the Second Department, from June 18, 2014 through June 15, 2015, Quaker Ridge moved the *361 tee box on hole No. 2 forward, to be more even or parallel with the Behar property (tr at 10, lines 6-13). During this period, as conceded by plaintiffs, no golf balls entered the Behar property from Quaker Ridge (tr at 690, line 25; at 691, line 5). Also, during the first half of 2015, Quaker Ridge made modifications to its course. It planted three large spruce trees to the right side of the original tee box area, and reconfigured the fairway and rough areas on hole No. 2 to add a landing area to the left side of the fairway (tr at 7, lines 3-9). The center line of the fairway was moved to the left, and the tee box was lowered and also moved to the left (tr at 421, lines 3-12). Quaker Ridge also uprooted and transplanted three extremely large trees to block off the Behar property—one of approximately 100 feet, and two of approximately 75 feet in height—from other areas on the golf course (tr at 422, lines 7-22). These modifications to hole No. 2 cost Quaker Ridge nearly $600,000 (exibit A38).[1]
On or about June 27, 2015, Quaker Ridge began to use exclusively “double logo” golf balls for play on hole No. 2, and stationed an employee on the second hole to obtain an accurate count of golf ball incursions onto the Behar property (exhibits A76-A78). Over the next 118 days, through October 22, 2015, Quaker Ridge counted 40 possible incursions (exhibit A102). This is consistent with the Behars’ count of 38 golf balls retrieved by them from their property for the same time period (tr at 704, line 14; exhibit 52).
On August 8, 2015, the Behars signed a petition, also approved by all of their 11 neighbors, urging the Village of Scars-dale Planning Board to deny any extension of the Quaker Ridge net permit, and to deny any expansion of Quaker Ridge’s net itself. The Behars wrote on the page of the petition that they signed:
“In the spring of 2011, we planted a row of 20 45 foot tall Norway Spruces, creating a natural screen taller than the temporary 40 foot net, thereby making the net obsolete. Under no circumstances should the net be heightened or extended as that was never the intent of the planning board.” (Exhibit 34; see also tr at 840, line 23; at 841, line 2.)
Despite the significant reduction in golf ball intrusions, the Behars seek future damages based upon their expert’s opinion *362 that their property value has been permanently diminished. They argue that this calculus is justified by their uncertainty of whether the permanent injunction is personal to the Behars themselves or whether it runs with the land. They also claim that even if it runs with the land, there is a permanent loss because Quaker Ridge could violate the permanent injunction (tr at 240, line 5; at 241, line 13).
Procedural Background
In this action for injunctive relief and to recover damages for nuisance and trespass, by order entered July 10, 2012, the Supreme Court, Westchester County denied the branches of the Behars’ motions for a permanent injunction and for summary judgment on the issue of liability, and granted Quaker Ridge summary judgment in its favor. The Second Department reversed, and held that the plaintiffs were entitled to judgment as a matter of law in private nuisance because Quaker Ridge operated its golf course in a manner that failed to sufficiently abate the number of golf balls landing on the Behars’ property, producing an injury that rendered their enjoyment especially uncomfortable and inconvenient. The Second Department also held that the Behars were entitled to judgment in trespass because the golf ball incursions occurred with such frequency and for such a long period of time that Quaker Ridge’s failure to take steps to sufficiently abate the situation constituted willfulness. The Second Department granted the Behars a permanent injunction enjoining Quaker Ridge from operating its course in such a manner that constitutes a private nuisance and causes trespass upon the Behars’ property, and reversed the dismissal of their complaint as ordered by the trial court.
The Behars now seek damages as a result of their injury, and also have brought four motions contending that Quaker Ridge is in contempt of the Second Department’s injunction, including an order to show cause on May 26, 2016 in this case, and also a petition under index No. 58705/2016, filed June 22, 2016, wherein the Behars seek to hold both the president and general manager of Quaker Ridge in contempt.[2]
The Supreme Court Decision, the Second Department Decision and the Number of Golf Balls
In its decision on Quaker Ridge’s summary judgment motion entered July 10, 2012, the only reference by the Supreme Court *363 to the number of golf ball incursions upon the Behars was: “Plaintiffs argue that they are entitled to summary judgment on their nuisance claim by establishing that generally about 3-4 golf balls fell on their property each day between May 2011 and June 2011.” (Behar v Quaker Ridge Golf Club, Inc., 2012 NY Slip Op 33604[U], *3 [Sup Ct, Westchester County 2011].) Later in the same decision, the Supreme Court noted, “At the outset the Court notes, that the facts of this case are undisputed.” (Behar, 2012 NY Slip Op 33604[U], *5.)
In its decision reversing the Supreme Court, the Second Department made no separate fact-finding of its own with regard to the number of balls, nor did it address where they landed on the Behar property (perimeter or more commonly occupied areas).[3] As already noted, its nuisance finding is solely that Quaker Ridge failed to reduce the number of golf balls landing on the Behars’ property. Its trespass finding states that “the plaintiffs’ submissions demonstrate that golf balls have invaded their property with such frequency and over such a long period of time.” (Behar v Quaker Ridge Golf Club, Inc., 118 AD3d 833, 835 [2d Dept 2014].) This court must assume that this refers to the Supreme Court’s “undisputed” 3-4 golf balls per day over a two-month period in 2011. Accordingly, the Second Department appears to have been relying upon Quaker Ridge’s ball count admissions of 103 balls between April 2, 2011 and June 28, 2011, which were annexed to affidavits submitted by Quaker Ridge’s ball counters.
Findings of Fact and Conclusions of Law
Relying upon the Second Department’s decision of June 18, 2014, Quaker Ridge is liable for nuisance and trespass for the three-month period of April 2, 2011 through June 28, 2011. As the Second Department made no other findings of fact that impact liability, this court will consider and determine what damages were sustained by the plaintiffs during the relevant subject three-month time period, and how they are measured. In the interest of judicial economy, also to be considered is the issue of liability for the period of June 2008 through April 1, 2011, and June 29, 2011 to the conclusion of trial, and any concomitant damages arising therefrom. Finally, the court will consider whether the Behars have suffered any permanent damages.
*364 The court notes that it is charged with determining a damages award based solely upon the findings of the Second Department, and that in general, it should not be unexpected that any house abutting a golf course—including the Behars’ house—would from time to time, receive three, four, five, or more balls on a given particular day of poor swings, and that there could be no liability on the part of a golf course for trespass, nuisance or concomitant damages.
Damages
The proper measure of damages for trespass is determined by assessing the value of the area actually occupied by the trespasser (Morales v Riley, 28 AD3d 623 [2d Dept 2006], citing Litwin v Town of Huntington, 248 AD2d 361 [2d Dept 1998]), for the period of time that the owner is kept out of possession (Rand Prods. Co. v Mintz, 69 Misc 2d 1055 [Civ Ct, NY County 1972], citing De Camp v Bullard, 159 NY 450 [1899]). These damages may be determined to be the greater of either the rental value or comparable usable value (Morales v Riley, 28 AD3d at 624). Here, there is not a physical trespass by human beings,[4] but the plaintiffs’ theory of trespass is premised on the golf balls that have randomly landed on their property.
The proper measure of damages for private nuisance is more subjective in nature because it involves as an essential element the interference with the landowners’ right to use and enjoy their land (Copart Indus. v Consolidated Edison Co. of N.Y., 41 NY2d 564 [1977]). In this case, minimal physical damages were alleged—an external light, a roof tile, and a window screen. No monetary value was offered as to those items. When the damages are permanent, the court’s task is easy, in that it merely looks at the diminution of the market value of the property (Guzzardi v Perry’s Boats, 92 AD2d 250 [2d Dept 1983]). Where the injury is temporary, the task is much harder. The damages are the reduction of the rental or usable value of the property (Guzzardi v Perry’s Boats, 92 AD2d at 254). Frequently, as here, there is no reason to think that the property owner has ever contemplated renting, so the task of this court is to weigh the plaintiffs’ subjective claims of interference, integrate them with their expert’s opinions and assumptions of how this causes a loss of rental value, and determine what the proper amount of damages is.
*365 Turning to the April through June 2011 period, the ball count that was admitted by Quaker Ridge in the affidavits of their ball counters is 103 balls over 87 days. Plaintiffs argued in their submissions supporting their summary judgment motion that this count,[5] standing alone, justified a finding that the golf ball intrusions exceeded the Nussbaum and Gellman standards, and so the Second Department held. A close look at the ball counts reveals several noteworthy days of concern: Tuesday, May 24, 2011, five balls; Thursday, June 2, 2011, 14 balls; Friday, June 3, 2011, seven balls; Saturday, June 18, 2011, five balls; Friday, June 24, 2011, five balls. On each of those five days, at least five balls landed on the Behar property. On five more days between May 20 and June 26, at least four balls landed on the Behar property. Again, these are the counts admitted by Quaker Ridge; the Behars’ count reflects high volume on May 7 and 8, and also the first week of July.
What is also clear from comparing ball counts by the Behars and Quaker Ridge is that it is an inexact science. The Behars did not always find the balls on the same day that they were hit, and Quaker Ridge did not have access to the Behars’ property to determine whether an errant ball actually landed on the Behar property. On certain days, each party counted more or less than the other party—with the other party’s numbers for those dates being more favorable to their case than their own. This also demonstrates that many balls are not actually interfering with the Behars’ lives, as some were only discovered upon inspection of the yard and perimeter areas, or were discovered after a day or even a week when they were not using their yard (tr at 609, lines 2-11; at 691, line 17; at 692, line 9). Nonetheless, the substantial numbers cited for the dates above are such that the Behars would not be able to substantially enjoy their property. Those dates fall within a three-month period.
The court has reviewed the vastly differing expert testimony and reports proffered by plaintiffs’ expert, Daniel Sciannameo, and defendant’s expert, James Levy. Particularly as pertains to this limited time period, neither are directly on point, nor *366 especially helpful in assessing loss of rental value. However, the court has based some of its conclusions on page 32 of Sci-annameo’s report (exhibit 46), which cites annual temporary damages of $146,205 for July 1, 2010 to June 30, 2011 and $154,755 for July 1, 2011 to June 30, 2012 (90% loss factor), and pages 4 and 43-44 of Levy’s report (exhibit 36), which cites annual temporary damages for July 1, 2010 to June 30, 2011 as $3,749-$5,623 and July 1, 2011 to June 30, 2012 as $3,960-$5,940 (10-15% loss factor). To assess damages for the proper three-month time period, the court needs to do more than math, by simply taking approximately one fourth of whatever yearly rent figure it adopts. It must account for the fact that the subject time period is spring and summer—a higher use period, a longer daylight period—in deciding whether to apply April through June lost backyard use figures (averaging to 26.33, not the full-year average of 21.9) as cited by Levy on page 43 of his valuation section of his report. If so, then that loss factor must be adjusted to reflect Levy’s and Sciannameo’s other findings and assumptions.
The first of those assumptions is starting rent. For the Be-hars, Sciannameo asserts it is $205,200; Levy’s starting rent is $170,400. After considering the testimony and exhibits, the court adopts $186,000, or $15,500 per month as the starting rent. The court disagrees with the Sciannameo assumption of 100% peak loss of use factor during golf season and 50% loss during off-peak season. However, since the three months at issue are during peak golf season, an 80% loss of use factor will be applied. The Levy loss of use calculations on page 43 of his report are inappropriate because the formula is inequitable. For the month of June, Levy cites 15 hours of potential backyard use, 15 hours of golfing hours, but cites a 60% loss factor for use. Thus, he discounts from 100% of the usable hours to 60⅞ factoring in the nine other hours of the day. Inexplicably, that is discounted further to 47⅞ when his lost use percentage factor is applied. In fact, it is more appropriate to consider the percentage of usable hours that are affected, to ensure that Quaker Ridge does not receive the benefit of discounting for nighttime hours. However, there are days during this time that golf was not played (i.e., Mondays, rain days) and days that the Behars reported no balls. The court also notes that in detriment to Quaker Ridge’s position, Levy likely *367 overestimated the golfing hours.[6] Thus, for these months an 80% loss of use factor is appropriate.
Lastly, a determination must be made as to what portion of the total property was affected by the nuisance. The Behars argue that they could use very little of their home, and Scian-nameo claims that there is a 90% loss factor—in other words, the Behars only retained 10% use of their property. This opinion is emphatically rejected. Likewise, Sciannameo’s conclusion that the Behars’ home is essentially impossible to rent is equally implausible—virtually ignoring the fact that the Scarsdale School District is highly desirable (tr at 999, lines 11-15). The Scarsdale schools alone—whether they live up to their reputation or not—make Sciannameo’s 90% and 45% rental loss estimates exaggerated, hyperbolic, and unreliable. Sciannameo’s estimates are: without any empirical support; fail to consider actual ball counts (tr at 285, lines 22-25; at 286, lines 5-25; at 288, lines 14-19); ignore pre-storm and post-storm levels of intrusion (tr at 288, lines 20-22); and in the case of a one-year period between June 18, 2014 and June 15, 2015 when no incursions occurred, still find a 90% loss during the golf season (tr at 303, lines 7-12). His entire analysis is based upon what the Behars and their attorney told him; however, at least for this one-year period, he was misinformed (tr at 303, lines 7-12). Tellingly, Sciannameo advocates a novel new standard—one that assumes and adopts a post-traumatic stress disorder standard, which is contrary to the Court of Appeals’ opinion in Nussbaum v Lacopo (27 NY2d 311 [1970]), common law, and common sense—that frequency of actual intrusions are irrevelant “once you’ve lost the use through the fear and risk factor” (tr at 286, lines 18-25).[7] Both at trial and in his report, Sciannameo made wild, sweeping conclusions without any basis, which was clear from his answers during cross-examination. For example, he failed to factor in the significant modifications made in 2015 by Quaker Ridge, which he dismissingly termed, “Band-aid measures” (tr at 305, lines 13-21). Then, he seemed completely detached from, or unaware of, major modifications to the second hole and ignored their successful remedial impact:
*368 “Mr. Musoff: So if you’re not aware of the significant modifications made to the second hole, then you didn’t take those into account, is it fair to say, in your damages analysis?
“Mr. Sciannameo: Well, if you tell me what modifications I did not take into account, I can tell you that. I mean, I know about the netting, you put up the netting; I know that occasionally the tees were moved up; and I believe there were some plantings. So if there was something besides that, then I didn’t—I did not take into account.
“Mr. Musoff: And you were not told by the Behars or Mr. Cohn that, in 2015, subsequent to those change [s], they only received about an average of two, maybe three balls a week; is that correct?
“Mr. Sciannameo: I think I was told that the frequency was less than it was before, yes.” (TV at 306, lines 11-24.)
On the other hand, Quaker Ridge and Levy correctly assert that the Behars’ loss is confined to the exterior of the house— primarily the backyard—and that as such, the loss factor is more appropriately between 10 and 15%. The court will adopt the higher 15% value for the area affected by the intrusion and concomitant inconvenience for April through June 2011. Thus, for the three affected months, total rent would be $46,500; after 80% peak loss of use factor, adjusted rent is $37,200; after 15% value of the affected area is applied, the lost rental value is $5,580.
Having now decided damages relating to the period of time addressed by the Second Department’s decision, the court now looks to the two-month period between the June 17, 2008 storm and the beginning of the pool construction (Aug. 19, 2008). The record shows that one or two communications occurred between Leon Behar and Steven Rittmaster of Quaker Ridge about golf balls shortly after the storm. While there was obvious disagreement between the Behars and Quaker Ridge about who was responsible for replacing the trees that fell, there is nothing to indicate that intrusions at this early stage were “the immediate or inevitable consequence of what [Quaker Ridge] willfully does, or which [it] does so negligently” (Phillips v Sun Oil Co., 307 NY 328, 331 [1954]). Likewise, a private nuisance claim for this time cannot be established without Quaker Ridge having notice of an ongoing trespass, because a pattern or recurrence of objectionable conduct is required (Domen Holding *369 Co. v Aranovich, 1 NY3d 117 [2003]).[8] During these two months following the storm, no pattern of objectionable conduct was established. Thereafter for nearly one year between August 19, 2008 and July 24, 2009, the Behars’ backyard was under construction as a result of their pool installation. As a result, any trespass during that time period was negligible and did not constitute a private nuisance, because it did not impact the Behars’ rights or use and enjoyment of their property to any significant degree. Also, the Behars did not keep a ball count until April 2010 when they commenced this action (tr at 811, lines 5-17). In assessing this time period, the court examined the testimony of Leon Behar, Judson Seibert, and Robert Musich, and the number of balls collected, and finds that no award is appropriate for this time period, as there is no evidence that Quaker Ridge was made aware by the Behars that the problem still existed or was ongoing, until commencement of this action or shortly prior thereto. The Behars’ attorney did not discuss possible legal action with Musich when they spoke a month before commencement (Mar. 9, 2010), during which conversation Musich was cooperative in agreeing to plant buffer vegetation and trees along the boundary of the properties to assist with the Behars’ area variance application (tr at 540, lines 7-17; at 542, lines 4-6). Then, for the approximately one-year period from commencement to April 1, 2011, the court also factored in the so-ordered stipulation entered into by the parties (Murphy, J.), which limited Quaker Ridge’s tee times in June, July, and August 2010, as well as the testimony elicited from Leon Behar (tr at 579, lines 14-23). Notably, that the latter portion of this time period directly preceded the time period that was the subject of the findings of the Second Department.
Rather than citing specific ball counts, it is held that there was a trespass and ongoing private nuisance, at least for the months of May, September, and October 2010, which immediately precede and follow the finding of the Second Department. Applying the same criteria cited above, the court notes that this period was during golf season, but not peak season. Given the shorter daylight hours and the fact that most of this period is not the summer, and children are in school, the court *370 finds that the peak/non-peak loss of use is only 25%. All other calculations remain the same. For the three affected months, total rent would be $46,500; after 25% loss of use factor, adjusted rent is $11,625; after 15% value of the affected area is applied, the lost rental value is $1,743.75 for damages for this period. All testimony and exhibits regarding the Behars’ addition of the row of Norway spruce trees, sprinkler, and retractable net, including attorney’s bill have been considered, however no portion of the cost of these items will be awarded. Specifically, while the Second Department found that the Be-hars were subjected to trespass and nuisance at or around this time, this court does not find the purported remedial measures taken by the Behars to be reasonable or necessary. While Leon Behar testified that he was compelled to buy the trees after seeing the “puny 30-foot trees that were installed on the club’s side of the property, as was mandated by the Village” (tr at 835, lines 21-23), he acknowledged that they were for immediate relief, and that he installed the highest trees available for purchase that his property could sustain (tr at 836, lines 9-18). Yet the highest point of those trees extended at best two to six feet above the 40-foot net installed by Quaker Ridge, and only offer minimal protection beyond that which is more comprehensively provided by the net. The court is not convinced that the Behars’ motivation in installing the trees was primarily for safety, rather than aesthetics, particularly given their statement on the Scarsdale Manor Homeowners Association petition against the extension of the net (exhibit 34). Also, at the time that the Behars planted their trees, the trees initially planted by Quaker Ridge—while not as tall as the Behars’ Norway spruces—had not had any time to grow and mature. There was every reason to expect that the Quaker Ridge trees would grow within a few years to a height at or above the net. Lastly, a sprinkler and drip system, while convenient, is not the only means of keeping the trees watered. Nearly all other aspects of the $11,068.20 bill (exhibit 25) reflect aesthetic lawn improvements, which are not compensable.
Next, during the period between June 29, 2011 to June 18, 2014, this matter was still pending. Both sides were represented by counsel, but the record reflects that no notices were given by the Behars to Quaker Ridge regarding the claimed golf ball intrusions (tr at 836, line 19; at 838, line 3). That is not to say that Quaker Ridge was unaware that occasional golf balls were intruding, as the Behars brought this action, and *371 Mr. Behar had a brief phone conversation with Robert Musich of Quaker Ridge about the balls (tr at 577, lines 18-21) and a phone call and email with Steven Rittmaster (tr at 578, line 14; at 579, line 13) and an unrelated call. However, rather than advising Quaker Ridge of particularly troubling numbers on any given day, or providing notice of their count at the end of each week or month, the Behars apparently just collected golf balls and kept them to produce them at trial (tr at 816, line 9; at 817, line 14; at 837, lines 11-17, 22; at 838, line 2). Importantly, most of this period of silence took place after Quaker Ridge’s 40-foot-high net was installed, and both the Behars and Quaker Ridge had planted rows of sizable trees on their respective sides of the net. As a result, while Quaker Ridge was on notice that the trespass and nuisance occurred before the net and trees were installed, the unexplained silence from the Behars for nearly three years severely undermines their claims that they were being “bombarded” and that balls were “raining” down on them.[9]
The testimony of Leon Behar further complicates the record, because he acknowledged that he had limited contact with Quaker Ridge. He stated that he first spoke to Robert Musich, then Steven Rittmaster about golf ball incursions, then spoke with Steven Rittmaster about an incident where a golfer urinated on his property (tr at 776, line 14; at 778, line 5). Musich testified that Leon Behar spoke with him about golfers urinating when they retrieved their golf balls in the one conversation he had with him (tr at 88, lines 9-11; at 97, lines 11-12). The Scarsdale Police dispatch log generated from Leon Behar’s reporting of the incident reflects that it occurred on June 6, 2008 (exhibit 106). All parties agree that the storm that felled the large trees creating a void allowing the increased golf ball incursions was on June 16 or 17, 2008 (tr at 93, lines 10-23). Therefore, Leon Behar’s recollection of his conversations with Quaker Ridge representatives is faulty because he testified that he was “getting bombarded” with golf balls and it had been “raining golf balls” prior to the urination incident (tr at 580, lines 4-23).
The next time period for the court to consider is from June 18, 2014 through June 18, 2015, when Quaker Ridge relocated *372 the tee boxes for hole No. 2. The Behars admit that they had no golf ball incursions during that time (tr at 690, line 25; at 691, line 5). Thus, the court finds that no damages were sustained for this time period.
The last period of time the court will consider is from June 19, 2015 to March 11, 2016, which was the last day of trial. During this period, Quaker Ridge resumed use of the original tee boxes for hole No. 2 after it made extensive modifications to the fairway, trees were planted along the right side of the tee box, and three very large trees were moved from other areas of the golf course to shield the Behar property from errant golf balls (exhibits 60, 61, 70, 72, 74, 75). During this time, both parties kept track of golf ball incursions or possible incursions. Beginning on June 27, 2015, Quaker Ridge exclusively utilized unique “double logo” golf balls on hole No. 2.
Quaker Ridge’s count from June 27 to October 22, 2015 (118 days) was 40 balls, which averages .34 per day, and 2.37 per week. The Behars’ count is nearly identical, collecting 38 total balls during calendar year 2015, of which 36 were double logo, and 2 were not the double logo balls (exhibit 52). Using the numbers that the Behars cite—which by definition is all that could cause them inconvenience and intrusion—the averages drop to .32 per day, and 2.23 balls per week. Almost five (fall and winter) months elapsed between that count and the end of trial in this matter, and no additional balls were claimed to have intruded, further debunking the assumptions and conclusions of plaintiffs’ expert, Sciannameo. Using either party’s count, the difference from 2011 is drastic. Ten balls per month is eminently reasonable for any homeowner adjacent to a golf fairway to expect as a trade-off for the benefits of living next to a golf course, and is consistent with “the occasional—‘once or twice a week’ errant golf ball that was found on plaintiff’s property” in Nussbaum v Lacopo (27 NY2d at 316), which was held not to be a sufficient impairment of that plaintiff’s rights. Therefore, for this last time period, the court finds no damages were incurred.
The Behars’ Extreme Position
Perhaps as a result of this protracted litigation over six years, the Behars now have taken an extreme position, which is simply inconsistent with their own actions in opposing a 40-foot net or 60-foot net, the Second Department’s decision, and the Court of Appeals’ decision in Nussbaum v Lacopo (27 NY2d 311 [1970]). In very revealing testimony, Leon Behar acknowledges the following:
*373 “Mr. Musoff: Is it your position that you received more or less golf balls after these changes were made than you received prestorm June 2008?
“Mr. Behar: There were fewer golf balls, but it did not change the fact that golf ball incursions continued, and I still could not have full use of my property because the golf ball incursions result— can result in people still getting seriously injured or killed” (tr at 847, lines 7-14).
While Mr. Behar essentially says that one golf ball is too many and can kill someone, the Behars opposed an increase in the size of the net, and petitioned to remove the 40-foot net that unquestionably would stop the rare golf ball that could pass through a gap in Quaker Ridge’s and plaintiffs’ trees. On the Behars’ behalf, Judson Seibert testified that he articulated to the Scarsdale Zoning Board that “[t]wo things were occurring: One, balls that were entering the property were coming in at a higher velocity; and, two, balls were coming in at a more frequent rate” (tr at 521, lines 17-20). The Second Department held that Quaker Ridge had failed to take precautions “in design and location, in the form of play, or in the erection of protective devices as a safeguard against injury to the plaintiff’s property.” (Behar, 118 AD3d at 835.) However, this simply is no longer the case. The Second Department held that Quaker Ridge had not taken steps to “abate” the situation. The Behars’ position reflects a misunderstanding of the term “abate,” which is not “eradicate” or “completely cease.” The Be-hars’ opposition to the continuation of the 40-foot net and any increase in its height severely undermines any prospective claims by the Behars of nuisance or permanent injury. Having embraced aesthetics over safety, the Behars cannot now use their literal lack of a shield as a figurative sword against Quaker Ridge. They have all but renounced their safety concerns by their formal, written, unequivocal opposition to Quaker Ridge’s application regarding the net. As noted by Justice Murphy in an earlier decision in this case, the plaintiffs were not surprised by the presence of a golf course next door to them. They claim that they then suffered “bombardment” and “raining golf balls,” but opposed a 60-foot net and sought to remove the existing 40-foot net. This appears to be the “sense [of] acceptance of risk and indifference to consequences” that the Court of Appeals cited in Nussbaum v Lacopo (27 NY2d 311, 316 [1970], citing Patton v Westwood Country Club Co., 18 Ohio App 2d 137, 247 NE2d 761 [1969]). Given their actions of *374 August 8, 2015 (when they signed the petitions opposing the net), even if the future level of golf ball intrusion were to surpass the “expected level of tradeoff” that an adjoining homeowner to a golf fairway should expect, any actual damages would necessarily have to be viewed through the prism of the Behars’ illogical opposition to the net. There is no reconciling their affirmative, strident opposition to a safety net with Mr. Behar’s emotional testimony about little girls possibly being killed by a golf ball (tr at 694, lines 6-21)—one that would likely be stopped by the net they opposed.
Permanent Damages
The final component of the compensatory damages to be considered is plaintiffs’ claim for permanent damages. Among Sciannameo’s unavailing opinions is that there is a diminution in fee value because Quaker Ridge has a pending appeal, or might violate the permanent injunction, or that the injunction may not run with the land. This is nothing more than mere speculation, and the court surely cannot award damages to the Behars based on the possibility that the decision of the Second Department upon which damages have been awarded herein might be reversed by the Court of Appeals. Like Leon Behar, Sciannameo opined that the temporary injunction had been violated because, “balls periodically were still invading the Be-har property” (tr at 240, lines 23-24). Notably, among the factors cited by Sciannameo for a purchaser wanting a discount, is the net itself: “And they’re going to look at the netting back there. Really, who wants that? Who wants to deal with these issues, these headaches? I would rather pay more, I would rather pay full boat and buy another property” (tr at 243, line 25; at 244, line 3). Missing from Sciannameo’s analysis is the fact that some of these factors—including a level of intrusion greater than the current one—existed before the 2008 storm that set Quaker Ridge’s liability in motion, and his analysis fails to recognize that the Behars chose to build a house on this property adjacent to a golf course that was in operation since 1918, and to install an in-ground pool despite those factors.
The position of the Behars and their expert fundamentally misunderstands the nature of tort law and compensatory damages, which is to restore an injured plaintiff to the position before the tort occurred (see Kreindler, Rodriguez, Beekman & Cook, New York Law of Torts § 21:3 [2016]). The Behars are *375 entitled to be made whole for damages caused as a result of Quaker Ridge’s negligence during the time for which they were found liable by the Second Department and this court, and nothing more. They are not entitled to move next to a golf course and to never suffer the intrusion of a golf ball. By the Behars’ own admission, Quaker Ridge abated the level of intrusions cited by the Second Department, and they have less golf ball intrusions than they had—even before the 2008 storm. The pendulum is back to the middle. There is no basis for the court to now put the Behars in a better position than they were in on June 15, 2008. They live next to a golf course.
For these reasons, even had the Behars not opposed Quaker Ridge’s net on August 8, 2015, they still failed to establish any permanent damages as a result of the liability found by the Second Department in its decision and order entered June 18, 2014.
Punitive Damages
Punitive damages may be awarded where the defendant is guilty of “quasi-criminal conduct,” “utterly reckless behavior,” “[a] malicious intent ... to injure plaintiffs,” or of “gross, wanton or willful fraud” (see Maitrejean v Levon Props. Corp., 87 AD2d 605, 605-606 [2d Dept 1982]). While the defendants had knowledge of its golf ball intrusions, and the Second Department characterized Quaker Ridge’s failure to abate the problem as “willful” there is no evidence that defendant’s operations were utterly reckless, malicious or fraudulent. These elements must be present in order to appropriately award punitive damages (see Gellman v Seawane Golf & Country Club, Inc., 24 AD3d 415 [2d Dept 2005]). Finally, Quaker Ridge’s initial resistance to make modifications to its course and its defense of this action were premised upon the club’s belief that the Behars were responsible for the loss of the natural tree barrier that was lost in the June 2008 storm. That resistance itself also does not rise to the level of recklessness, fraud, or maliciousness, but it was reasonable. While the Second Department disagreed with that position, it is noteworthy that two Justices of the Supreme Court (Murphy, J., and Giacomo, J.) substantially agreed with Quaker Ridge on that issue, so it cannot even be characterized as frivolous. In sum, while Quaker Ridge is liable for compensatory damages as noted herein, punitive damages are not appropriate.
*376 Conclusion
As a result of the trespass and nuisance found by the Second Department, it is adjudged that plaintiffs shall have judgment against the defendants for $7,323.75, with interest accruing from July 30, 2011.

. Attorney’s fees and payroll expenditures for ball counters are not considered by the court as a cost of modifications.

. Those motions will be decided separately from this decision.

. Quaker Ridge raised this issue as an issue of fact in its opposition papers to the Behars’ summary judgment motion.

. Other than the one incident where an unidentified person came from Quaker Ridge’s property and urinated on the Behar property in 2008.

. The affidavit of Leon Behar and affirmation of Julius W. Cohn, sworn to December 6, 2011, both referenced 73 balls over the 52-day period of May 7, 2011 through June 28, 2011, noting that plaintiffs believe the number to be higher.

. While golf can be played until dark, it is extraordinarily unlikely that golfers would be teeing off at hole No. 2 after 7 p.m., even if they were only playing nine holes.

. The court notes that if indeed this standard were adopted, it would solely apply to the Behars, as he also asserts that future purchasers would essentially buy the home for 60 cents on the dollar (tr at 247, lines 3-6).

. It is axiomatic that Quaker Ridge does not hit golf balls. Its individual members, guests, and invitees hit golf balls. Until Quaker Ridge was specifically made aware of ball counts that the Second Department has concluded should have triggered a concern about trespass and nuisance, there is no reason to believe that Quaker Ridge was on notice that anything other than occasional, expected stray golf balls had escaped the confines of its golf course.

. The court’s review of the record also shows that the Behars’ affirmative characterization of “bombardment” and “raining golf balls” was primarily, if not exclusively stated for periods prior to the installation of the net and trees.