2023 IL App (2d) 220426
No. 2-22-0426
Opinion filed August 8, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| WAUKEGAN GAMING, LLC, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 22-LA-66 |
| | ) | |
| THE CITY OF WAUKEGAN, | ) | Honorable |
| | ) | Luis A. Berrones, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    In a three-count complaint, plaintiff, Waukegan Gaming, LLC (Waukegan Gaming),
sought compensatory damages and costs against defendant, the City of Waukegan (City), for
breach of contract, promissory estoppel, and equitable estoppel. The City moved to dismiss, and
the circuit court dismissed all three counts. See 735 ILCS 5/2-619(a)(9) (West 2020). Waukegan
Gaming appeals, arguing that (1) Public Act 101-31 (eff. June 28, 2019), the 2019 amendments to
the Illinois Gambling Act (Act) (230 ILCS 10/1 *et seq.* (West 2020)), did not render void the
redevelopment agreement between Waukegan Gaming and the City, (2) its obligations under the
redevelopment agreement were not illusory, (3) the City had the authority to grant Waukegan
Gaming exclusive authority to develop a casino in Waukegan, (4) the redevelopment agreement

was not terminable at will, and (5) the complaint stated valid estoppel claims. Because we determine that the City lost the authority to enter into the redevelopment agreement, and estoppel is not available because the agreement was void, we affirm the circuit court's order dismissing Waukegan Gaming's complaint.

¶ 2                                    I. BACKGROUND

¶ 3                            A. Predevelopment Agreement

¶ 4      In 1992, Alan Ludwig, the principal of Waukegan Gaming, was approached by the City about redeveloping the City's downtown, lakefront property because the City was *not* selected by the General Assembly as an authorized site for a riverboat casino. Ludwig joined with Richard Stein to form SL Waukegan, LLC (SL), to investigate and pursue the possibility of developing and operating a casino in the City. To pursue this project, Ludwig retained John O'Connell, a registered lobbyist, to represent SL's interests in expanding riverboat gambling to the City. SL also acquired options to purchase approximately 40 acres of land near the City's lakefront, and it prepared and submitted a "Riverboat Gambling Report," which outlined the proposed development.

¶ 5      On September 20, 1993, SL entered into a "pre-development agreement" with the City. Therein, the City agreed to "neither encourage, assist nor promote, either directly or indirectly, during the term of [the predevelopment agreement], any gaming facility development activities proposed by any other person or entity other than [SL]." In exchange, SL agreed that it would (1) continue investigating the viability of developing a riverboat casino on the City's lakefront, (2) consult with the City when SL determined it was appropriate to do so, and (3) continue pursuing legislation to expand gaming to Waukegan. This agreement was amended and renewed several times until 2004.

¶ 6                            B. Redevelopment Agreement

¶ 7    On January 16, 2004, SL and the national casino operating company Harrah's Operating Company (Harrah's) entered into a "redevelopment agreement" with the City. This agreement was executed in anticipation of the public auction of Emerald Casino, Inc.'s, gambling license, so that SL and Harrah's could bid on the license and develop a casino in the City. In relevant part, the agreement stated that the City would contribute 35 acres of land to the project and the developer, SL, would rely on the agreement in incurring expenses related to funding the casino project. The agreement also provided:

"A. *Grant of Right.* City grants to Developer the right to develop and operate a casino in the City (the 'Exclusive Right'). The Exclusive Right shall continue for so long as Project is operating, provided however, that, if the law of the State of Illinois requires that the Exclusive Right have a definite term, the term of the Exclusive Right shall be limited to twenty (20) years, subject, at the option of the Developer, to extension for three additional consecutive terms, each of ten (10) year duration. Each extension term shall be deemed to have been exercised unless the Developer provides written notice to the City that it does not elect to extend the Exclusive Right.

City shall not, while the Exclusive Right is effective:

1.  negotiate or discuss with any other person or entity the development or operation of a casino within the City; or

2.  authorize or assist any person or entity other than the holder of this Agreement to develop or operate a casino within the City." (Emphasis in original.)

¶ 8    Ultimately, the joint venture between Harrah's and SL was not successful in obtaining the Emerald Casino gambling license; however, the developers agreed, pursuant to the redevelopment

agreement, to continue to pursue the casino project. Under the agreement, the City agreed to support the developers in securing another riverboat gambling license.

¶ 9    On January 10, 2005, SL and Harrah's formed Waukegan Gaming to pursue the casino project in the City. Four days later, Harrah's assigned the redevelopment agreement to Waukegan Gaming and later withdrew from the joint venture. On March 1, 2006, Waukegan Gaming and the City entered into an amended agreement, recognizing Waukegan Gaming as the sole developer.

¶ 10    Approximately 11 years later, Ludwig had lunch with the City's mayor. The mayor purportedly encouraged Ludwig to continue pursuing a gambling license for the City, and he never indicated that the agreement expired or was void.

¶ 11                  C. 2019 Amendments to the Act and Litigation

¶ 12    On June 2, 2019, the General Assembly amended the Act (Pub. Act 101-31 (eff. June 28, 2019), authorizing the Illinois Gaming Board (Gaming Board) to grant the City a license to operate a casino (hereinafter, 2019 amendments to the Act). 230 ILCS 10/7 (West 2020). Nearly one month after the amendments' passage, corporate counsel for the City notified Waukegan Gaming that the redevelopment agreement was "not a valid, enforceable contract at this point in time."

¶ 13    Thereafter, the City sued Waukegan Gaming, seeking a declaratory judgment that the redevelopment agreement was no longer valid, based on the passage of the amendments. On July 3, 2019, the City issued a request for proposals (RFP), soliciting developers for the development and operation of a Waukegan casino. The deadline for filing a proposal was August 5, 2019. On July 18, 2019, Waukegan Gaming answered the complaint and filed a counterclaim. Prior to the RFP deadline, Ludwig entered an agreement with Rush Street Gaming and Churchill Downs Incorporated to submit a joint proposal. In this agreement, Rush Street Gaming was granted final

decision-making authority over the City's lawsuit against Waukegan Gaming, and the corresponding counterclaim.

¶ 14    On October 21, 2019, Ludwig's joint proposal was selected as one of three finalists to be certified to the Gaming Board. Rush Street Gaming thereafter agreed with the City to dismiss the lawsuit against Waukegan Gaming, and the corresponding counterclaims, without prejudice. Rush Street Gaming later withdrew its Waukegan casino application to the Gaming Board in order to pursue a casino opportunity in Chicago.

¶ 15                          D. Waukegan Gaming 2022 Litigation

¶ 16    On March 3, 2022, Waukegan Gaming filed a three-count complaint for breach of contract, promissory estoppel, and equitable estoppel, alleging breach of the exclusivity provision of the redevelopment agreement.

¶ 17    Thereafter, the City moved to dismiss (735 ILCS 5/2-619(a)(9) (West 2020)). It alleged, *inter alia*, that the redevelopment agreement was not a valid and enforceable contract, because the City lacked the authority to enter into the agreement and the amendments to the Act invalidated the agreement. The City also asserted that the estoppel claims should be dismissed because the agreement was made in violation of a statutory provision and, therefore, estoppel did not apply.

¶ 18    On October 25, 2022, the circuit court granted the City's motion to dismiss, finding that the amendments invalidated the redevelopment agreement because the General Assembly intended for the process of granting casino licenses to be open, competitive, and transparent. Despite finding the remainder of the City's arguments moot, it went on to find that (1) Waukegan Gaming's promises were illusory, (2) the City lacked the authority to grant Waukegan Gaming an "open-ended, irrevocable, and exclusive right" to develop a casino in the City, (3) it was not clear that the exclusivity provision in the agreement was ever triggered, (4) the agreement was terminable at

will, and (5) an unenforceable contract cannot be the underlying basis for estoppel claims. Waukegan Gaming appeals.

¶ 19                                        II. ANALYSIS

¶ 20    Waukegan Gaming argues that the circuit court erred in dismissing its complaint on the basis that the 2019 amendments to the Act invalidated the redevelopment agreement. It contends that (1) the agreement was a proper exercise of the City's home rule powers, (2) the Act does not require an open and competitive bidding process to select a developer, (3) there was nothing untoward about the agreement, (4) its promises under the agreement were not illusory, (5) the agreement was not terminable at will, and (6) the claims of estoppel were valid. For the following reasons, we reject Waukegan Gaming's arguments.

¶ 21    Section 2-619 of the Code of Civil Procedure permits a party to file a motion to dismiss where "the claim asserted *** is barred by *** affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2020). An "affirmative matter" is "something in the nature of a defense that negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint." *Glisson v. City of Marion*, 188 Ill. 2d 211, 220 (1999). When reviewing a section 2-619 dismissal, "[t]he relevant question is whether there exists a genuine issue of material fact precluding dismissal, or absent an issue of material fact, whether dismissal is proper as a matter of law." *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 613 (2007). We accept all well-pleaded facts as true and "construe the pleadings and supporting documents in the light most favorable to the nonmoving party." *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55. We review *de novo* a dismissal pursuant to section 2-619(a)(9). *Glisson*, 188 Ill. 2d at 221.

¶ 22                        A. The Redevelopment Agreement and the Act

¶ 23    Waukegan Gaming first argues that the circuit court erred in finding that the 2019 amendments to the Act rendered the redevelopment agreement void. The circuit court based its ruling on its interpretation of the Act and its finding that "the issuance of casino licenses and the operation of casinos is solely governed by the State of Illinois." We begin with an analysis of the City's authority to contract, as it relates to the Act.

¶ 24    Our state constitution allows home rule units, counties, and municipalities to "exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a). However, the General Assembly may "preempt the exercise of a municipality's home rule powers by expressly limiting that authority." *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 31. If the powers are not expressly limited, a municipal ordinance and a state statute may operate concurrently as provided in article VII, section 6(i): "Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." Ill. Const. 1970, art. VII, § 6(i); see also 5 ILCS 70/7 (West 2020) (noting that laws limiting the powers of a home rule unit must specifically state the manner and extent of the limitation).

¶ 25    Here, Waukegan Gaming argues that the legislature did not expressly preempt the City's ability to enter into casino development contracts; thus, the redevelopment agreement and the exclusivity provision are valid and enforceable. We disagree.

¶ 26    The Act was originally enacted in 1990, "to benefit the people of the State of Illinois by assisting economic development and promoting Illinois tourism." Ill. Rev. Stat. 1991, ch. 120, ¶ 2402(a). While the legislature recognized that

> "[the] authorization of riverboat gambling will enhance investment, development and tourism in Illinois, it is recognized that it will do so successfully only if public confidence and trust in the credibility and integrity of the gambling operations and the regulatory process is maintained. Therefore, regulatory provisions of this Act are designed to strictly regulate the facilities, persons, associations and practices related to gambling operations pursuant to the police powers of the State, including comprehensive law enforcement supervision." Ill. Rev. Stat. 1991, ch. 120, ¶ 2402(b).

The 2019 amendments to the Act specifically promulgated that "[t]he regulation and licensing of organization gaming licensees and gaming conducted pursuant to an organization gaming license are exclusive powers and functions of the State. A home rule unit may not regulate or license such gaming or organization gaming licensees." 230 ILCS 10/7.8 (West 2020).

¶ 27    The legislature's 2019 amendments imposed licensing certification requirements on municipalities, which the Gaming Board was to consider before issuing a gaming license. *Id.* § 7(e-5)(i)-(viii). These requirements include, *inter alia*, (1) negotiating in good faith, (2) discussing a location for the casino, (3) agreeing to profit sharing, and (4) agreeing to any local ordinance issues. *Id.* Prior to board certification, a municipality is required to hold a public hearing to discuss the certification requirements, and the municipality must pass a resolution detailing the proposed riverboat or casino. These new licenses are required to be issued by the Gaming Board "pursuant to an open and competitive bidding process". *Id.* § 7.12(a).

¶ 28    Contracts entered into by a municipality that are expressly prohibited by law are void *ab initio*. *Diversified Computer Services, Inc. v. Town of York*, 104 Ill. App. 3d 852, 858 (1982). A municipality may exercise only the powers given to it by statute and the constitution, and "a municipality cannot be bound by a contract that does not comply with the prescribed conditions for the exercise of its power." *Id.* (quoting *Ad-Ex, Inc. v. City of Chicago*, 207 Ill. App. 3d 163, 169 (1990)). Contracts entered into by municipalities "are subject to be interfered with or otherwise affected by subsequent statutes enacted in the *bona fide* exercise of the police power ***." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 531 (2009); see also *Kirwin v. Peoples Gas Light & Coke Co.*, 173 Ill. App. 3d 699, 713 (1988) (finding that a preexisting contract is not " 'considered a limitation on the exercise of the State's police power' ").

> "Although a municipality may not avoid enforcement of a contract based on some irregularity in the formation of the contract if it has otherwise properly entered into the contract and the other party has substantially performed its obligations, it is equally true that a contract entered into without authority is *ultra vires* and void." *Elk Grove Township Rural Fire Protection District v. Village of Mount Prospect*, 228 Ill. App. 3d 228, 234 (1992).

Where a party chooses to contract with a municipality in a heavily regulated industry, it "should not upset their expectations" when they find themselves subject to further regulations. *Commonwealth Edison Co.*, 398 Ill. App. at 530.

¶ 29    Here, the City lost its authority to enter into the redevelopment agreement with Waukegan Gaming. The agreement states that Waukegan Gaming was granted an exclusive right to "*develop and operate* a casino in the City." (Emphasis added.) Although Waukegan Gaming asserted at oral argument that the agreement was only a developer contract, this proposition is rebutted by the

foregoing language of the contract and logic. It would be illogical for Waukegan Gaming to spend significant effort in building a casino in the City, only to ultimately decide not to operate that casino. Moreover, the contract language makes clear that it was the intent of Waukegan Gaming to develop *and operate* the casino. Applying for and receiving an owner's license is a necessary feature of *developing and operating* a casino. See 230 ILCS 10/3(a) (West 2022) ("Riverboat and casino gambling operations and gaming operations pursuant to an organization gaming license, as defined in this Act, are hereby authorized to the extent that they are carried out in accordance with the provisions of this Act."); *Id.* § 7.

¶ 30    Moreover, the agreement specifically states that the City shall "support Development *** to secure another riverboat gaming license, and to conduct riverboat gaming," at the exclusion of other developers, and precluded the City from: "1. Negotiat[ing] or discuss[ing] with any other person or entity the development or operation of a casino within the city; or 2. Authoriz[ing] or assist[ing] any person or entity other than the holder of this Agreement to develop or operate a casino within the City."

¶ 31    These key provisions of the redevelopment agreement conflict with the 2019 amendments to the Act. As established, the State has exclusive authority to regulate gaming and gambling licenses. The agreement, however, attempts to preclude the City from negotiating, discussing, authorizing, or assisting any other entity from pursuing certification for a casino license in the City. Adherence to the agreement would preclude fulfillment of the licensing requirements outlined in section 7(e-5). Moreover, the intent of the Act is to have an open, transparent, and competitive gambling system, which would be thwarted if Waukegan Gaming's position were adopted. See *Id.* §§ 2, 7.12(a). The exclusivity provision would make it impossible for there to be a continuous and open bidding process in front of the Gaming Board, because the City would be

precluded, under the agreement, from completing the certification requirements with multiple applicants.

¶ 32　The redevelopment agreement attempts to regulate the application of gambling licenses, frustrates the purpose of the Act, and precludes the City from complying with the Act's mandates. This cannot stand, where the State has the exclusive authority to regulate gaming and licensing procedures. We need not address whether the City had authority to enter into the predevelopment agreement in 1992, because the City's ability to enter into that agreement was always " 'subject to be interfered with or otherwise affected by subsequent statutes enacted in the *bona fide* exercise of the [State's] police power' " (*Commonwealth Edison Co.*, 398 Ill. App. 3d at 531; see also *Kirwin*, 173 Ill. App. 3d at 713) and, since 1992, the State has taken exclusive authority over the regulation of gambling licenses. Moreover, Waukegan Gaming chose to contract with the City in a heavily regulated industry that has only continued to amass additional regulations since 1992. *Commonwealth Edison Co.*, 398 Ill. App. 3d at 530 ("Furthermore, it has been observed that where the parties to a contract are engaged in a heavily regulated industry, that they should be subject to further such regulation should not upset their expectations."). Because the City lost its authority to enter into the redevelopment agreement, the contract is void. *Sibley v. Health & Hospitals' Governing Comm'n of Cook County*, 22 Ill. App. 3d 632, 637 (1974) ("A contract which violates a valid statute is void. There is no exception to this rule, for the reason that the law cannot enforce a contract which it prohibits."). The City's powers to contract in this area must cede to the State's exclusive authority to regulate the operations of casinos. See *McMahon v. City of Chicago*, 339 Ill. App. 3d 41, 45 (2003). Because we find the redevelopment agreement void, we will not address the remainder of Waukegan Gaming's breach-of-contract claims.

¶ 33　　　　　　　　　B. Promissory and Equitable Estoppel

¶ 34 In counts II and III, Waukegan Gaming alternatively alleged claims for promissory and equitable estoppel. Waukegan Gaming argues that these claims are predicated on

"repeated unambiguous promises and representation to Ludwig, SL, and Waukegan Gaming that if they continued to pursue a casino for the City, they would have the exclusive right to develop and operate the casino and that the City would not encourage, assist or promote, directly or indirectly, any efforts by other parties to develop or operate a casino in the city."

¶ 35 To establish promissory estoppel, Waukegan Gaming must show that the City made an unambiguous promise and that Waukegan Gaming relied on that promise to its detriment. *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 95. The doctrine of promissory estoppel is properly applied where there is an absence of an express agreement. It is not intended to provide parties to a negotiated bargain with a "second bite at the apple" if a breach-of-contract claim fails. *Id.* ¶ 92.

¶ 36 Alternatively, to establish equitable estoppel, Waukegan Gaming must show that the City knowingly made misrepresentations to Waukegan Gaming and that it reasonably relied on those representations in good faith to its detriment. *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313-14 (2001). In particular, equitable estoppel may be used against a municipality only where the plaintiff can plead facts that show "(1) an affirmative act by either the municipality itself or an official with express authority to bind the municipality; and (2) reasonable reliance upon that act by the plaintiff that induces the plaintiff to detrimentally change its position." *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 40. Equitable estoppel may apply to municipalities but only in extraordinary and compelling circumstances. *Id.* ¶ 35.

¶ 37    The circuit court correctly dismissed Waukegan Gaming's estoppel claims. Where a contract is void because the municipality had no authority to act, the agreement cannot, alternatively, be enforced by estoppel or ratification. See *Matthews*, 2016 IL 117638, ¶ 98 (promissory estoppel); *Ligenza v. Village of Round Lake Beach*, 133 Ill. App. 3d 286, 290-91 (1985) (equitable estoppel); accord *DeKam v. City of Streator*, 316 Ill. 123, 136-37 (1925) ("[A municipality] cannot be estopped to dispute the validity of a contract which it had no power to make, for the reason that it has received the consideration."). Where claims are negated as a matter of law, they are properly dismissed under section 2-619(a)(9). 735 ILCS 5/2-619(a)(9) (West 2020); *Glisson*, 188 Ill. 2d at 220. Here, the contract was void because the City was not authorized to regulate gaming or gambling licenses and, therefore, any promises made by the City to Waukegan Gaming about the licensing and exclusive operation of a casino in the City are unenforceable under the doctrine of estoppel. Consequently, the dismissal of the estoppel claims was not erroneous.

¶ 38                                III. CONCLUSION

¶ 39    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 40    Affirmed.

*Waukegan Gaming, LLC v. City of Waukegan*, **2023 IL App (2d) 220426**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 22-LA-66; the Hon. Luis A. Berrones, Judge, presiding. |
| **Attorneys for Appellant:** | Michael H. Moirano, of Moirano Gorman Kenny, LLC, of Chicago, and Mark A. Van Donselaar, of Churchill, Quinn, Hamilton & Van Donselaar, of Grayslake, for appellant. |
| **Attorneys for Appellee:** | Glenn E. Davis and Charles N. Insler, of HeplerBroom LLC, of St. Louis, Missouri, for appellee. |